Weldoh, J.,
delivered the opinion of the court:
The petitioner is a corporation created and existing under the laws of the State of New York, with its place of business in the city of New York.
On the 19th day of June, 1899, the Commissioner of Internal Revenue entered into contract with the claimant under the provisions of the act of Congress entitled “An act to provide ways and moans to meet war expenditures, and for other purposes,” approved June 13, 1898 (30 Stat. L., sec. 25, p. 445), by which contract the claimant was to print internal-revenue stamps for the defendants of certain denominations at the price of 80 cents per thousand, which contract is annexed to the petition and made a part of the same, marked “ B.” The contract was to commence on the 1st day of July, 1899, and continue for the period of one year, with the right of either party to terminate upon certain conditions.
On the 25th of April, 1899, the Commissioner issued a notice as follows, to wit (Exhibit A) : “ To contractors for imprinting stamps,” in which it is provided that the year in which the stamps were to be printed should commence on the 1st day of July, and that in addition to the provisions in contracts now existing there shall be added in substance as follows: That each contractor will be required to pay salaries aggregating the sum of $3,400 for one Government stamp agent and two counters, payable monthly; that contractors shall charge all persons requiring the same the sum of 80 cents per thousand; that “ no application for contract to imprint stamps for a period named will be considered from any person, firm, or corporation not now engaged in *94 printing stamps under contract with the Government.” Then follow other provisions not necessary to be qxioted. Said notice is annexed to the petition and marked “ Exhibit A.”
It is alleged that by mutual mistake and accident said last paragraph was omitted, from the contract dated on the 19th dajr of June, 1899, and known as “ Exhibit B.” It is also alleged that there is omitted from said contract, by accident and mutual mistake, the provision that applications will be received at the office of the Commissioner of Internal Revenue, Washington, D. C., until May 25, 1899.
It is also alleged, as' an amendment to the fifth paragraph of the original petition, that the said contract of July 19, 1899, was accepted by your petitioner without examination or reading, upon the assurance of the representative of the defendants that it contained all the provisions of the preliminary contract.
The seventh paragraph of the original petition avers in substance that several weeks after the 25th of May aforesaid, in violation of the said contract, the defendants did receive and grant applications for a similar contract to the American Imprinting Company, a corporation not engaged in imprinting stamps under contract with the Government on the 25th of April, 1899.
It is alleged that many of the persons composing the American Imprinting Company had been, before the 1st of July, 1899, customers of the claimant in the printing business, and satisfied with the work performed before that time b}^ the claimant, and would have continued to have the claimant do their work; but that, in consequence of the defendants having awarded a contract to the said American Company, the said customers procured their work to be done' by said company, to the prejudice and damage of the right of the claimant.
By the amended petition it is charged that the loss and damage to the claimant during the period for which said agreement was made with the claimant amounted to the sum of $20,584.99, in the way of a loss of profits in not being permitted to perform the work which had been *95 diverted from the claimant to the American Imprinting Company, and also the sum of $500 for loss on press.
On the 25th of May, 1899, the claimant company addressed to the Commissioner-of Internal Revenue a communication marked “-Exhibit D,” made a part of the petition, in which it is in substance stated that application is made for a contract to continue for one year from July, 1899, in accordance with official communication dated April 25, 1899, to pay salaries aggregating $3,400, for one Government agent-and two counters, and to receive the sum of 80 cents joer thousand and $1 per thousand, depending on the size of the sheets. Attached thereto is guaranty of the American Insurance Company to furnish bond in the sum of $25,000 for the faithful performance of the contract.
The prayer of the amended petition, founded on the foregoing allegations, is that the contract aforesaid be amended by the insertion of the following:
“ And it is further agreed by and between the parties hereto that the party of the first part shall not receive, consider, or grant, and has not received, considered, or granted any application for a similar contract to imprint stamps as hereinbefore described and provided, from any person, firm, or corporation, which was not actually engaged in imprinting said stamps under contract with the party of the first part on the 25th day of April, 1899.” And also that a judgment be rendered against the United States in the sum of $21,084.99.
This proceeding is based upon the first section of the act entitled “ An act to provide for the bringing of suits against the Government of the United States,” commonly known as the Tucker Act (24 Stat. L., p. 505). In that act it is provided, in defining the jurisdiction of the courts of the United States in suits against the United States, that they shall have jurisdiction: “First, all claims founded upon the Constitution of the United States or any law of Congress, except for pensions; or upon any regulation of an Executive Department; or upon any contract, expressed or implied, with the Government of the United States; or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect to *96 wliicli claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty, if the United States were suable.”
It is contended on the part of the claimant that under said provision the Court of Claims has .complete and ample jurisdiction to correct the contract, if a common and mutual mistake was made by the parties, in the reduction of the contract to writing; and that, having jurisdiction for that purpose, the court has full jurisdiction and authority to settle and adjudicate the rights of the parties on the contract as amended, as their rights may appear from the facts of the case as established by the proof. It is insisted on the part of the defendants that the court is without jurisdiction to reform the contract, as asked by the prayer of the petitioner.
The question of the jurisdiction being preliminary to all other questions, the court must determine that question before reaching the facts and the law upon the merits of the controversy. Prior to the passage of the Tucker Act it must be conceded that the court was without jurisdiction except where given by a special act of Congress; but in the passage of the Tucker Act, which was intended to define accurately and enlarge the jurisdiction of this court, the Congress have employed an enlarged statement of the jurisdiction of the court in this, to wit, “ in respect to which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty', if the United States -were suable.”
In support of the contention that the court has jurisdiction the counsel for the claimant relies on the terms of the Tucker Act and the decision of this court in the case of the South Boston Iron Works v. The United States (34 C. Cls. R., p. 200), in which it is said, “ Since the passage of the act of 1887 the Court of Claims has equity power to reform a contract so to effectuate the full intention of the parties.” The authority of that case is questioned by the counsel for the defendants. The proceeding involved the question of the reformation of the contract, which was in the case by the pleadings of the claimant and by the contention of the parties, ivas material in the determination of the rights of the litigants, and was decided by a full bench.
*97 In the case of Harvey v. The United States (105 U. S. R., 671; 8 C. Cls. R., 501) the court took jurisdiction under a special statute (19 Stat. L., 490), the law providing “And to that end jurisdiction is hereby conferred on said court, to proceed in the adjustment of the accounts between said claimant and the United States, as a court of equity jurisdiction, and may, if according to the rules and principles of equity jurisprudence, in its judicial discretion reform said contract and render such judgment as justice and right between the claimants and said Government may require.” It was held in substance by the Supreme Court that it was competent for the Court of Claims, proceeding as a court of equity jurisdiction under the authority of the statute, to reform the contract, and to determine and adjust the accounts of the parties arising thereunder. The legal condition in that case and this case differs in this, that in the Harvey ease the court proceeded under a special act giving equitable j uriscliction, and in this case the proceeding is under a general statute which as it is claimed gives equitable power to the court as to the subject-matter and relief sought by the claimant.
In support of the theory that the court is without jurisdiction, counsel cites the case of Jones v. The United States (131 U. S., p. 1). That was a proceeding to enforce a demand or claim against the United States bjr compelling an executive officer to do and perform a certain act, to wit, to deliver to the plaintiff a patent for public land which, as he alleged, he had purchased from the United States; the court held that, under the Tucker Act, the District and Circuit Courts and Court of Claims of the United States had no jurisdiction, and refused the relief by reversing the decree. It is said:
“ It seems, therefore, that in the point of providing only for money decrees and money judgments, the law is unchanged, merely being so extended as to include claims for money arising out of equitable and maritime as well as legal demands. We do not think that it was the intention of Congress to go further than this.”
The Jones case (supra) was not to recover a money judg *98 ment, but to compel the performance of a specific act of executive duty. This case is wholly for the purpose of recovering a judgment against the United States for 'the violation of a reformed contract. The relief is not in the abstract, so far as enforcing a pecuniary obligation is concerned, but directly bearing upon such an obligation. In the Jones ease much stx-ess is laid on the subject-matter of the litigation, to wit, the public lands. In justification of the conclusions at which the court arrived it is said:
“ We should have been somewhat surprised to find that the administration of vast public interests like that of the public lands, which belong so appropriately to the political department, had been cast upon the courts, which it surely xvould have been if such a wide door had been opened for suing the Government to obtain patents and establish land claims, as the counsel for the appellees in these cases seems to imagine.”
The grant of judicial power in the Harvey case (supra) is:
“ Jurisdiction is hereby conferred on said court to proceed in the adjustment of accounts between the claimant and the United States as a court of equity jurisdiction., and may, if according to the rules of equity jurisprudence, in its judicial discretion reform said contract and í'eñder such judgment as justice and right between the claimants and said Government may require.” The court was dmected and empowered to proceed in the adjustment of the rights of the parties “ as a court of equity juinsdiction.”
That is, there was a grant of power; and as incident to that grant the Supreme Court decided that it clothed (in connection with the other provisions of the statute) this court with complete equity jurisdiction to settle the questions of controversy incident to the subject-matter of litigation and affected by such reformation.
Recurring to the provisions of the Tucker Act, “ in respect to which claims the party would be entitled to redress against the United States, either in a court of law, equity, or admiralty, if the United States were suable:”
If the United States were suable in a court of equity like an individual, could any question arise as'to the jurisdiction of a court of equity to entertain a suit for the reformation of' *99 the contract upon the grounds alleged in the petition and the subject-matter of this suit?
This court having equity power by the Tucker Act, is not its jurisdiction as complete as it was in the Harvey case, under the special act giving the court jurisdiction? Equity jurisdiction is given by both, and the reformation and correction of a contract is among the landmarks of equitable jurisdiction of courts of chancery.
In the case of Hearne v. Marine Insurance Company (20 Wall., 490) it is said by the Supreme Court, upon the question of the reformation of a contract: “ The reformation of written contracts for fraud or mistake is an ordinary head of equity jurisdiction. The rules which govern the exercise of this power are founded in good sense, and are well settled. Where the agreement as .reduced to writing omits or contains terms or stipulations contrary, to the common intention of the parties, the instrument will be corrected so as to make it conform to their real intent. The parties will be placed as they would have stood if the mistake had not occurred.” (Kerr on Fraud and Mistake, 419, 420.)
The jurisdiction of the Court of Claims is not general. It may not have the right to grant injunctions or decree the performance of contracts; but where a suit will result simply in a decree for the payment of money it has jurisdiction under the Tucker Act as fully as other courts of equity, and as fully as it- has under certain special acts, such as that under which the Harvey case was brought.
Having decided that the court has jurisdiction to reform the contract upon sufficient proof, and the incident right to determine the whole case as to the question of the alleged error and the damages to claimant because of the alleged misconduct of the defendants in violation of the contract as it is amended (if the court determines that a reformation is justified by the proof), we proceed to consider whether the claimant is entitled to a reformation of the contract in the particulars alleged in its petition.
It is contended by the claimant that the proof establishes the fact that both parties, to wit, the Commissioner of • Internal Revenue and the agent of the claimant, made a *100 mutual mistake, omitting from the contract the provision as to not letting contracts to persons who on the 25th of April, 1890, had not already subsisting contracts with the United States for imprinting stamps upon checks, etc., and also the omission of the clauses that no bids would-be received after noon of the 25th of May, A. I). 1899.
The defendants’ counsel insist that the proof is insufficient to establish that a mutual mistake was made, and the contract as written should govern and determine the result in this proceeding. “ The law has laid down the fundamental rule that in all cases if the mistake is clearly made out bj'-proofs entirely satisfactory, equit}^ will reform the contract so to make it conformable to the precise intent of the parties. But if the proofs are doubtful or unsatisfactoi-y and the mistake is not made entirety plain, equity will withhold relief upon the ground that the written paper ought to be treated as the full and correct expression of the intent, until the contrary is established beji-ond reasonable controversy.” (Story’s Equity Juris., vol. 1, sec. 152.) If the rights of the parties are to be determined by the oral testimony in the case, they might be controlled by the strict rule prescribed in this authority. But the court is not left to the consideration of the oral testimony alone; the advertisement for bids must be considered in the determination of the question as to whether a mistake was made in the reduction of the contract to writing in the form of Exhibit B.
The evidence as to the making of the written contract on the 25th of June, 1899, is substantially confined to the testimony of Mr. Milliken, the agent and president of the claimant company, and Mr. Johnson, chief clerk of the stamp division of the Internal Revenue Bureau, and by their testimony in connection with the exhibits and circumstances is to be determined the issue as to whether there was a mistake made in the reduction of the original agreement to the terms as they are exemplified in the written contract.
The president of the claimant company testifies that on May 25, 1899, he had an interview with the Commissioner of Internal Revenue, in which the Commissioner asked him whether he intended to make application for renewal of the *101 contract, to which he answered that he so intended, but not until the time approached 12 o’clock, the time for closing; that he clid not want to take any chances of any applications being put in by persons who did not have contracts on April 25, 1S99, and that the Commissioner assured him that no such application would be received. He was afterwards informed by the Commissioner that his application would be accepted and that the contract would be renewed. The defendants object to this testimony on the ground that the Commissioner was dead at the time the testimony was taken.
The president then called upon Mr. Johnson, chief clerk of the stamp division of the Internal Revenue Bureau, and informed him that his contract had been renewed, and was told by Mr. Johnson that it had been decided that the application of any person who had a contract would be granted. The chief clerk then delivered to the president of the company two copies in blank of the contract to be executed, whereupon the president said: “ I presume the only changes from the other contract are those contained in the letter or communication dated April 25, 1899,” and the chief clerk answered: “ That is all.”
The president of the claimant company then took the contracts to New York, and subsequently executed them without reading and returned them to the Commissioner of Internal Revenue. Prior to the 1st day of July, 1899, the president was informed that a contract for the same kind of work had been granted to the “American Imprinting Company.” The president then states that said company did not have a contract to imprint stamps on April 25, 1899, and also did not make an application prior to 12 o’clock of May 25, 1899. He .examined his contract, and then for the first time discovered that it failed to state that no application would be received from any person, firm, or corporation who did not have a contract on May 25, 1899, and that it did not state that no application would be received after 12 o’clock of said date.
The president then went to Washington and had an interview with the Secretary of the Treasury, and mentioned to him the fact that the American Company had a contract in *102 violation of his agreement. Pie states that it was admitted by the Secretary that the American Company had a contract, granted inadvertently. The Secretary refused to revoke the contract of said company for the reason that the Commissioner was absent from the city, but said that if it should be violated in any way he would revoke it at once.
The contract of the “American Imprinting Company ” was revoked for violation, to take effect November 30, 1899, but was extended, as witness states, to January 1.
The attention of witness, the president, is called to the letter of acceptance by David Milliken, dated May 25, 1899, omitting any reference to that clause of the contract which recites that “ no application for contract to imprint stamps for the period named would be considered from any person, firm, or corporation not now engaged in imprinting stamps under contract with the Government.”
To the inquiry with reference to that contract witness replies: I did not consider it relating to the subject-matter of the contract. I considered it in my mind in making application. I did not consider it relating directly to the subject-matter of the contract; I did not look at the contract when I received it to see what it contained.
In a subsequent examination for the purpose of correcting his testimony he says: Where it appears that it was after I received the contract in duplicate that I did not consider that the omitted provisions related directly to the subject-matter of the contract, what I meant to say was that it was at the time I made application for the contract. In my letter of acceptance, as it appears, it was made in accordance with the circular letter of April 25,1899, and the matters specifically mentioned by me are only those I claim I was obliged to do.
Upon cross-examination he says in substance: What I meant was that at the time when I considered that the restriction did not relate to the subject-matter of the contract, was when I made the application for the contract and not when I received the contract in duplicate.
Mr. Johnson testifies in substance: I did not at any time make any statement to the agent of the company regarding *103 contents of the intended contract, which I intended he rely on to the exclusion of his finding out for him-what was in the contract. I prepared the original con-in 1898, Contracts of 1899 were prepared prior to 1899, filled up, omitting signatures, and forwarded to parties who had signified their intention and willingness sign contracts. There were changes made from contracts 1898. After such changes were made twenty-five or thirty copies of the contracts were prepared in blank for the new contractors. I went over the contracts with the Commissioner, conferred about terms and conditions, as I did about business of that importance. No reference was made in contract as to number of bidders or bond to be furnished, that no applications would be received after 12 o’clock. Such matters were not omitted from the contract by mistake my part. There was no intention on the part of the Internal Revenue Bureau to put those provisions in the contracts. I had several conversations with Mr. Milliken as to the method of doing business, but I have no recollection of the matters discussed which he refers to. I made no statement to him as to the contents of the second contract, upon which I intended to have him rely as to such contract. The Commissioner and myself agreed upon the changes to be made. We intended at the time the letter of April 25, 1899, was written to restrict contracts to those who had them on that date; that was the intention when the letter was written. Our intention was not to receive applications after 12 o’clock; it was our purpose not to receive applications after 12 o’clock. I remember conversations with Mr. Milliken, but do not recollect any conversation in which the language used by him was made use of by me. I am not prepared to saj' that such conversations were not had. I do not recall whether the Commissioner actually read the contract or not. I was impressed with the idea that he did. He was a very careful business man, and in matters of that importance he would run over things which I did, either with me or by his comparing it or reading it himself. I was not authorized at the time of the alleged contract with Mr. Milliken to make statements to intending contractors as to what the contracts they were going to sign contained for the purpose of having *104 them rely solely upon what my understanding was of the contents of those contracts.
If the testimony of the president of the claimant company is taken as true, it must be conceded that he thought and believed at the time he received the contract from Mr. Johnson, the chief clerk, that the provisions in controversy were in the agreement, and upon the faith-of that belief, founded on the assurance of the clerk, he accepted and executed the contract without reading.
It is insisted by counsel for the defendants that he was guilty of-negligence in that particular, in not reading the contract, but relying upon the word and assurance of the clerk. While that in the abstract might be considered carelessness, it is not such carelessness as relieves the opposite party from the obligation imposed upon him by his representation of the terms of the agreement. If the United States had been misled or prejudiced by the carelessness of the president of the claimant company it might operate as an estoppel against the company, but in the absence of any such consequences to the rights of the defendants they can not insist that the confidence which he reposed in the statements of the clerk was carelessness upon his part. Mr. Johnson, the clerk, substantially contradicts the testimony of the president of the claimant company in some particulars, in which he says: “ I made no statements to him (the president of the claimant company) as to the contents of the second contract upon which I intended to have him rely as to such contract. The Commissioner and myself agreed upon the changes to be made. We intended at the time the letter of April 25, 1899, was written to restrict contracts to those who had them on that date; that was the intention when the letter was written. Our intention was also not to receive applications after 12 o’clock. He remembers conversations with the president of the claimant company, but does not recall any conversation in which the language given by him was used. Mr. Johnson is not prepared to say that such- conversations were not had, and does not recollect whether the Commissioner read the contracts or not, but that he usually ran over such things with the clerk by comparing them or reading *105 them himself; that the provisions were not omitted from the contract by mistake on his part.
It is stated by the clerk that he and the Commissioner conferred about the terms and conditions of the contract; that as a result of such conference the contracts were prepared in the form in which they were, and that there was no intention on the part of the Internal Revenue Bureau to put those provisions into the contract.
' Both provisions are contained in Exhibit A, which constitutes the basis and terms upon which the claimant company contracted with the United States, and that these terms were important to the interest of the claimant is shown by the fact of the interest which the president of the claimant company took in ascertaining as to whether any persons not then contractors with the United States would be regarded as competent bidders in the letting of new contracts, and the fact that the president did not put in the bid of the company xmtil the exact time that proposals for the contract were to be received; that these provisions, especially the one with reference to not receiving bids from any person not theretofore contractors, were important is shown by the result of other persons being permitted to make bids in violation of the policy announced by the defendant in the notice to contractors.
The persons forming the American Imprinting Company, who have received upon their contract a large proportion of the printing matter, had been the customers of the claimant during the execution of the former contract, and having succeeded in getting a contract of their own for the company in which they were the stockholders, they transferred their patronage from the claimant company to the American Imprinting Company, thereby depriving the claimant company of the profits which it would have derived from the patronage of the stockholders of the new company if the new company had not been organized and had not been successful in bidding for the new issue of stamps.
It was decided by the Supreme Court in the case of Harvey v. The United States (supra) that the formal contract subsequently drawn was intended to embody the terms used in *106 the advertisement inviting proposals for the work; that by such omission the contract varied essentially from the publication of proposals, and that although the contract ivas drawn in that way, it ivas a mistake against the right of the contracting party, which he had the right to reform, thereby making the contract embody substantially the terms proposed in the notice to bidders inviting proposals.
Applying the principles of law determined in the case of Ilarvey (supra) to this case, is not the plaintiff company in this proceeding entitled to have the contract executed in the form in which it would have been prepared if the substantial terms had been inserted as its provisions? In this particular there is a remarkable identity with the case of the Equitable Insurance Company v. Hearne (supra). In that case the defendant wrote a letter to the plaintiff offering to insure at a rate named. In this case the defendants likewise sent a communication to the claimant inviting it to do work at a compensation named. In the former case the preliminary agreement was followed by a formal contract, the policy of insurance. In this case the preliminary agreement Avas followed by the formal contract. In the former case the plaintiff accepted the policy of insurance without examination and raised no objection to it until after the loss of the vessel insured. In this case the claimant accepted the formal contract without examination and raised no-objection to it until after the defendants had contracted with the American Imprinting Company. In both cases it was the defendants "who prepared the form of contract, and in each case the matter complained of was the omission of one element of the contract in the preliminary agreement.
If this be true, as stated bjr Johnson, that the Bureau made no mistake in omitting the provisions from the contract, and that it was not intended to embody them in the agreement, does that fact in hvw deprive the petitioner of his right of reforming the contract so as to agree with the notice to bidders, which is the advertisement for proposals? The bid of the company was made on the basis of the notice of Avhat would be the conditions and terms of the agreement in case a contract Avas made. The bid having been accepted, *107 the contract which was to be reduced to writing was ex- ■ pecteci to follow the terms indicated by the advertisement for proposals.
As is said in the Harvey case (671 supra), the written bid in connection with the advertisement and the acceptance of that bid constituted the contract between the parties, so far as regards the question whether the contract prices embraced the dam. (Garfielde v. United States, 93 U. S., 242.)
The restriction of contracts to persons already having-contracts, as stated in the advertisement to bidders, must have been intended as an inducement to those persons to bid, and, as is shown by the testimony of the president of the claimant company, and the result of allowing other persons to become competitors, this restriction was a very material consideration in the minds of the bidders having-subsisting contracts. The effect of the restriction was to increase the volume of the business and thereby enhance the profits arising from the performance of the work in the fulfillment of contracts. One of the items of damages is for loss on a press provided in contemplation of the extent of the work.
It may be said that a part of the consideration which induced the making of the contract on the part of the claimant was the restriction to bidders having subsisting contracts. The provision of restriction established a condition the effect of which was to increase the profits of the company, and thereby became a material part .of the contract. The payment of 80 cents per thousand was the compensation ivhich was to be received by the cbmpany, but it did not constitute the only consideration or inducement operating on the minds of those intrusted with the business of the company.
It is said in substance by the chief clerk, “ We intended at the time the letter of April 25, 1899, was written to restrict contracts to those who had them on that date, and our intention was not tó receive contracts after 12 o’clock.”
In violation of the restriction of the 25th of April the defendants did let contracts in effect to persons who under former contracts had been the customers of the claimant company, and thereby a part of- the consideration which op- *108 eratecl as an inducement to the making of the contract failed, to the prejudice and damage of the claimant.
It is contended that the provision as to limitation of bidders is against public policy, and therefore it would have been inoperative if inserted in the contract. To that contention it may be replied that the printing of the stamps did not cost the United States anything, and therefore it was a policy which might be adopted by the Department without any violation of the rights and interests of the United States, the maximum price being fixed so as to protect the just rights of those who might be compelled to use the stamps.
The damages in this case are neither conjectural nor uncertain. The claimant has shown specifically what losses there were in consequence of the existence of the American Imprinting Company. They have shown that the}'' lost these customers because of that contract. They have shown specifically the amount of custom which these customers carried to the American Company. The only rebutting evidence which the defendants could have offered to this was that some of these customers would have withdrawn their patronage if the American Company had not existed. There has been no attempt to prove that fact, but, on the contrary, customers have testified substantially that they would not have withdrawn their business. The onty remaining question is, what would have been the claimant’s profit on the business withdrawn? And on that question the evidence is much more complete and satisfactory than in ordinary cases where a contractor is seeking to recover his gains prevented.
The contract when written should have been in substance the terms contained in the advertisement, and any substantial deviation from those terms by the mistake of the parties may be corrected in this court if such mistake is established by the evidence. The proof shows that the company, through its president, made a mistake in assuming that the restriction was in the contract and, as we have already said, was guilty of no material negligence in not reading the agreement before it was executed. The agents of the *109 United States made a mistake when they omitted the restriction from the agreement, whether it was intentional or’ accidental ; therefore both parties have made a mistake in violation of the rights of the company.
The court having acquired jurisdiction to correct the mistake, is authorized by law to take complete jurisdiction of the subject-matter of the contract in order that the controversy may be fully and finally settled. The evidence shows that in consequence of the diversion of the trade of its former customers the claimant was damaged to the extent'of the' profits which it would have made on the work so diverted, which amounts to the sun of $21,084.99.
It is therefore adjudged and decreed that the contract be reformed according to the decree herein entered, and that the claimant recover from the defendants as shown in said decree.
The following decree was thereupon entered by the court:
This case being argued and submitted on the 7th day of November, 1904, the court, upon the evidence, and the question of law involved, hereby adjudges and decrees that the contract, dated on the 29th of June, 1904, be so reformed as to embrace the substance of the clause in Exhibit “A” of the petition filed herein, which is in the words following, to wit:
“ No application for contract to imprint stamps for period named will be considered from any person, firm, or corporation not now engaged in imprinting stamps under contract with the Government,”
and that the same be, and is, considered by the court as forming a part of Exhibit “ B ” (the contract) in the determination of the question of the claimant’s right to recover; and upon a full consideration of the case, with such reformation,
It is hereby adjudged and decreed that the claimant recover from the defendants the sum of twenty-one thousand and eighty-four dollars and ninety-nine cents ($21,084.99), its damages for the violation of said contract so reformed.