**Helen MITCHELL et al.**

v.

**The UNITED STATES.**

**Nos. 772–71 to 775–71.**

United States Court of Claims.

Jan. 24, 1979.

Charles A. Hobbs, Washington, D. C., attorney of record, for plaintiffs. Wilkinson, Cragun & Barker, Jerry R. Goldstein and Robin A. Friedman, Washington, D. C., of counsel.

David M. Marshall, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant. Craig A. Decker, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KUNZIG, BENNETT and SMITH, Judges, en banc.

## ON DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

DAVIS, Judge:

These connected suits [1] by individual Indians and two Indian groups present claims for damages said to arise from the Government's management and disposition of the claimants' property. The principal plaintiffs are (1) 1465 individuals owning interests in Indian trust allotments on the Quinault Reservation in the State of Washington and (2) the Quinault Tribe which now has about 4,000 acres on the Reservation.[2] The Reservation, consisting mainly of forest land, was established in 1873. Over a number of years, the Government, acting primarily under the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C. §§ 331 *et seq.* (1976), allotted the whole Reservation in trust to individual Indians. About a third of the Reservation has by

---

1. There are four cases which have been consolidated.

2. Also a plaintiff is the Quinault Allottees Association, an unincorporated association to protect and promote the interests of Quinault Reservation allottees.

now gone out of trust, but a very substantial amount has remained in trust status.[3] The Government, through the Department of the Interior, has managed these tracts, selling the timber, handling the sale of individual allotments, and taking general care of the Indians' proceeds and monies from the tracts.

These suits accuse the defendant of various acts of mismanagement alleged to constitute breaches of trust for which the Government is liable.[4] Much was done in the cases after their filing in 1971—discovery, considerable preparation of experts' studies, a partial trial of three weeks duration, plans for further trials—without any challenge to this court's subject-matter jurisdiction.[5] However, after the partial trial in 1977 the defendant belatedly filed a motion to dismiss for lack of jurisdiction; the ground was that all the mismanagement claims in these cases rest on the theory of a breach of trust by the defendant and that

this court does not have jurisdiction of such breach of trust claims. This is the motion which is now before us and which we consider.[6] We reject the Government's position and hold that the court properly has jurisdiction of these suits.[7]

I

■ Our authority to entertain the actions is invoked under 28 U.S.C. § 1491 (1976) (insofar as the suits are by individual Indians)[8] and 28 U.S.C. § 1505 (1976) (actions by or on behalf of Indian tribes, bands or groups).[9] Defendant's first jurisdictional objection is that claims based on breach of trust are judge-made elaborations, unconnected with the Constitution, statutes, treaties, regulations, executive orders, or contracts—and therefore outside the congressional consents-to-sue embodied in sections 1491 and 1505. We skip (without passing upon) the grant of jurisdiction over claims against the United States "for liquidated or

---

**3.** For a history of the formation of the Reservation and of the allotment process, *see Quinault Allottee Ass'n v. United States*, 485 F.2d 1391, 1393–95, 202 Ct.Cl. 625, 629–32 (1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d 312 (1974).

**4.** In their brief, plaintiffs thus summarize their allegations against defendant:
  (1) Failure to obtain fair market value for the allottees' timber when it was sold either under multiple-allotment, long-term contracts, individual allotment contracts, or land-and-timber sales;
  (2) Failure to manage the timber sales and harvesting on the Reservation on a sustained yield basis and failure to rehabilitate the land after logging;
  (3) Failure to obtain any payment at all for some of the allottees' merchantable timber;
  (4) Failure to develop a proper road and easement system on the Reservation and allowing improper charges to be made to the allottees in connection therewith;
  (5) Failure to pay interest on advance deposit and other funds to the allottees;
  (6) Failure to obtain sufficient interest on Indian monies; and
  (7) Excessive charges to the allottees for administrative fees.

**5.** Nor was such a challenge made in the other *Quinault* cases, earlier considered, raising parallel issues. *Quinault Allottee Ass'n v. United States*, 453 F.2d 1272, 197 Ct.Cl. 134 (1972); 485 F.2d 1391, 202 Ct.Cl. 625 (1973) *cert. denied*, 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d

312 (1974); *Capoeman v. United States*, 440 F.2d 1002, 194 Ct.Cl. 664 (1971).

**6.** Since the question posed by defendant's motion is jurisdictional, we entertain it despite the Government's failure to raise the point earlier in the litigation. *See* Ct.Cl.R. 38(h).

**7.** Aside from any effect of the statute of limitations, an issue which is not now before us and which we therefore do not even reach.

**8.** 28 U.S.C. § 1491 provides in pertinent part: "The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

**9.** 28 U.S.C. § 1505 provides: "The Court of Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band or group."

unliquidated damages in cases not sounding in tort"[10] because here the Indians do not rest their case on unanchored judge-created principles of fiduciary law but point to and rely upon specific legislation as creating the trust relationship.

To sustain jurisdiction it is enough for us that the General Allotment Act, 25 U.S.C. §§ 331 et seq. (1976), governing the tracts involved in these cases, expressly declares the fiduciary connection. Section 5, 25 U.S.C. § 348, states that the allotment-patents "shall be of the legal effect, and declare that *the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in the case of his decease, of his heirs * * ** and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged *of said trust* and free of all charge or incumbrance whatsoever" (emphasis added). (The trust thus expressly established was extended first temporarily and then indefinitely by section 2 of the Indian Reorganization Act of 1934, 25 U.S.C. § 462 (1976).)[11]

The next question is whether this statute can ground the money claims asserted here for breach of trust. We do not hesitate to hold that the congressional declaration of trust in the General Allotment Act "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained" because of a proven breach of trust. *See United States v. Testan,* 424 U.S. 392, 400, 402, 96 S.Ct. 948, 955, 47 L.Ed.2d 114 (1976), citing *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1009, 178 Ct.Cl. 599, 607 (1967). There is no requirement that Congress say expressly that damages can be recovered for breach of the trust.[12] That conclusion is the necessary inference from the statute. It is inconceivable, for instance, that Indian allotment-patentees whose lands were wholly wasted by the Government could not recover compensation in this court for such a violation of fiduciary obligation. No other remedy would exist since there is no administrative channel for obtaining compensation, and prospective judicial relief by way of injunction or mandamus (assuming such a remedy exists at all) would be meaningless for damage already done.[13] The same

---

**10.** This phrase appears in section 1491 but, as the court has already pointed out, section 1505 covers the full ground of section 1491. *See Klamath & Modoc Tribes v. United States,* 174 Ct.Cl. 483, 489–90 (1966).

Defendant repeats the old myth that this court has no jurisdiction over monetary claims harking back to equitable principles. We continue to reject that incorrect proposition. *See, e. g., Quinault Allottee Ass'n v. United States,* 453 F.2d 1272, 1274 n. 1, 197 Ct.Cl. 134, 138 n. 1 (1972); *Pauley Petroleum, Inc. v. United States,* 591 F.2d 1308, at 1315–1317 (Ct.Cl. 1979).

**11.** Defendant suggests that the trust created by the General Allotment Act is solely to prevent improvident alienation of the tract by the Indian beneficiaries, and has no other incidence. But that is not what the statute says, nor is it the way in which the Act has been administered. The legislation states that the Government is to "hold" the allotted land "in trust *for the sole use and benefit of the Indian*" (emphasis added), thus indicating that the Government, as trustee, is to manage and conserve the property for the Indian, on a continuing basis, so long as the land remains in trust. And the Interior Department has regularly sought to

fulfill that trust; it does not confine its oversight just to sales or outright transfers of the tract itself. *See Squire v. Capoeman,* 351 U.S. 1, 10, 76 S.Ct. 611, 100 L.Ed. 883 (1956). That is the nature of a trust allotment in which the United States has fee title and the Indian has only equitable title. *See Squire v. Capoeman,* 351 U.S. 1, 4 & n. 5, 10, 76 S.Ct. 611, 100 L.Ed. 883 (1956). Somewhat different is a "restricted allotment" in which the Indian holds the fee but cannot convey it without governmental approval. That was the nature of the allotment in *United States v. Bowling,* 256 U.S. 484, 486–87, 41 S.Ct. 561, 65 L.Ed. 1054 (1921).

**12.** *Eastport* spelled out that such "fair" interpretation included rights to monetary recovery granted "expressly or by implication." *See* 372 F.2d at 1007, 1008, 178 Ct.Cl. at 605, 606.

**13.** In contrast, in *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Court considered that civil service employees improperly classified had prospective administrative remedies under the Classification Act, which were all that Congress provided or contemplated, especially in view of the "established rule" that "one is not entitled to the

is true of lesser breaches of trust, leading to monetary injury which is shown to have been incurred. If there is no remedy under 28 U.S.C. sections 1491 and 1505, there is in effect no real redress at all for a departure from the standards Congress imposed on the Government in the General Allotment Act. Such a result, urged on us by the Government, is not compelled by that Act nor, in our view, would it be a correct interpretation. The trust language in the statute means that compensation can be recovered for a breach of trust provided that Congress has consented to suit on monetary claims, as it has in sections 1491 and 1505.

This is the stance we have consistently taken up to now in this kind of controversy. In *Klamath & Modoc Tribes v. United States,* 174 Ct.Cl. 483, 491–92 (1966), although we held that we could not order a general accounting at the outset, we emphasized at the same time that "[i]f, after a trial on the issue of liability, it is held that defendant has violated its *statutory fiduciary obligations,* it will be within the jurisdiction of the court to order the defendant in its capacity as a trustee to render an accounting for the purpose of enabling the court to determine the amount which plaintiffs are entitled to recover" (emphasis added), and that under sections 1491 and 1505 those Indian plaintiffs had "a forum for the recovery of any damages to which they are entitled because of the Government's mishandling of tribal funds and property. No special jurisdictional act is required to provide that relief." *See also* 174 Ct.Cl. at 490–91.

Similarly, in *Mason v. United States,* 461 F.2d 1364, 1374, 198 Ct.Cl. 599, 617 (1972), *rev'd* 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973), the court said: "A suit against the United States on behalf of the estate of a non-competent Indian, for damages compensating the estate for breach by the Government of its trust obligation under a

federal statute, is within 28 U.S.C. § 1491 as a claim founded upon an Act of Congress and for damages 'in cases not sounding in tort.' The Osage Allotment Act implies that, if the Government breaches its trust duty to the pecuniary disadvantage of a non-competent Osage allottee, due compensation will be paid by the United States" (citing *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 178 Ct.Cl. 599 (1967), among other decisions).[14]

There are also Indian cases in the same class which we have entertained with a somewhat briefer explanation of why we accepted jurisdiction. *See Cheyenne-Arapaho Tribes v. United States,* 512 F.2d 1390, 1392, 206 Ct.Cl. 340, 345 (1975); *Fields v. United States,* 423 F.2d 380, 383, 191 Ct.Cl. 191, 196 (1970); *Capoeman v. United States,* 440 F.2d 1002, 1002, 194 Ct.Cl. 664, 666 (1971); *Quinault Allottee Ass'n v. United States,* 485 F.2d 1391, 1392, 202 Ct.Cl. 625, 628 (1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1980, 40 L.Ed.2d 312 (1974); *Coast Indian Community v. United States,* 550 F.2d 639, 652–53, 213 Ct.Cl. 129, 134, 152–53 (1977).

Our continued acceptance of Indian claims for breach of trust—where the existence of the trust obligation is founded on a statute, treaty, executive order or regulation, or an agreement—comports fully with the expectation of Congress that what is now 28 U.S.C. section 1505 (first enacted in 1946 as section 24 of the Indian Claims Commission Act, 60 Stat. 1055) would cover the post-1946 "legal" claims (*i. e.* other than purely "moral" claims) of Indian entities "so that it will never again be necessary to pass special Indian jurisdictional acts in order to permit the Indians to secure a court adjudication on any misappropriations of Indian funds or of any other Indian property by Federal officials that might occur in the future." 92 Cong.Rec. 5313 (1946) (statement of then Congressman Jackson, committee chairman and principal sponsor

benefit of a position until he has been duly appointed to it." *See* 424 U.S. at 402, 403–04, 96 S.Ct. at 955.

14. In reversing on the merits, the Supreme Court did not question this court's jurisdiction. *See United States v. Mason,* 412 U.S. 391, 394 & n. 5, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973).

of the Indian Claims Commission bill in the House of Representatives). *See Klamath & Modoc Tribes v. United States,* 174 Ct.Cl. 483, 488–89 (1966).[15] The report on the Indian Claims Commission bill made by the House Committee on Indian Affairs characterized the forerunner of section 1505 as giving the Indian "the same right as his white or black neighbor to secure a full and free hearing in the Court of Claims, or any other appropriate tribunal, *on any controversy with the Federal Government that may arise in the future.*" (emphasis added). H.R.Rep.No.1466, 79th Cong., 1st Sess. 3, *reprinted in* [1946] U.S.Code Cong.Serv., pp. 1347, 1349. Moreover, in statements which obviously blanketed both the past and the future, the report declared that: "If we fail to meet these obligations by denying access to the courts when trust funds have been improperly dissipated or other fiduciary duties have been violated, we compromise the national honor of the United States"; the report also observed that the Indians' inability at that time to obtain a day in court "on the one hand, encourages bureaucratic disregard of the rights of Indian citizens by a small minority of governmental officials who are comforted by the thought that there is no judicial redress available to the victims of their maladministration and, on the other hand, gives color to grievances which may assume tremendous proportions in the minds of the Indians where a full and fair trial would show that the grievance is wholly imaginary." H.R.Rep.No.1466, 79th Cong., 1st Sess. 5, *reprinted in* [1946] U.S.Code Cong. Serv., pp. 1347, 1351.

■ If we accepted defendant's current argument, these objectives, so plainly expressed when the predecessor of section 1505 was adopted in 1946, could not be fulfilled, or even advanced.[16] Congress would still have to do that which it did not want or expect to do in 1946—continue to pass special jurisdictional acts or from time to time to have to enlarge this court's general jurisdiction over Indian money claims. We are justified, therefore, in concluding that Congress, when it passed section 1505, considered that Indian trust legislation, such as the General Allotment Act, supplies a proper foundation for Indian monetary suits in this court to recover compensation for proven breaches of those trusts.[17]

## II

■ Because we hold that the General Allotment Act, in itself, sustains plaintiffs' right to pursue their breach of trust allegations, we do not have to consider whether claims could be founded, in the absence of a trust provision comparable to that in the Allotment Act, upon the other pieces of legislation and regulation invoked here by the Indians.[18] Plaintiffs put these forward

**15.** Congressman Jackson also said: "The Interior Department itself has suggested that it ought not to be in a position where its employees can mishandle funds and lands of a national trusteeship without complete accountability" and "let us see that the Indians have their fair day in court so that they can call the various Government agencies to account on the obligations that the Federal Government assumed." 92 Cong.Rec. 5312 (1946).

**16.** Breach of trust claims—founded on statute, treaty, executive order, regulation, or agreement—have formed a large segment of post-1946 Indian cases under sections 1491 and 1505, and were expected in 1946 to be perhaps the main grist of those mills.

**17.** The views of the 1946 Congress are not *controlling on the meaning and scope of the* General Allotment Act which was passed in 1887, but it is helpful to have the explicit and authoritative understanding of the 1946 Congress which went deeply into the problem of redressing wrongs against Indians and provided judicial and quasi-judicial remedies. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81 & n. 8, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *FHA v. Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958). Of course, the views of the 1946 Congress have greater impact on section 1505, which was first enacted by it.

**18.** These statutes are: 25 U.S.C. §§ 406 and 407 (1976) (directions as to sale of timber); 25 U.S.C. § 466 (1976) (operation and management of Indian forestry units on sustained-yield principle); 25 U.S.C. § 413 (1976) (collection of reasonable fees for work done for Indians); 25 U.S.C. §§ 349 and 372 (1976) (issuance of fee patents to allottees or heirs found to be competent and capable of managing their affairs); 25

as additional, independent sources of jurisdiction but we do not reach that contention. For the most part, all we need and do hold is that, in the instant cases, account should be taken of these other statutes in deciding whether the Government violated its obligations as trustee under the General Allotment Act. To the extent applicable, these additional statutes furnish statutory directives—substantive rules of conduct—which help to determine the obligations and undertakings of the Federal Government as such trustee. For the purposes of the present cases it is irrelevant whether these other statutes, by themselves, would also create a trust relationship if the General Allotment Act were inapplicable. At the least, the other legislative provisions on which plaintiffs rely can furnish congressional gauges of proper trustee conduct, once it has been established, as here, that the Government is a trustee. Defendant seems to believe that this court cannot review discretionary acts of government officials for arbitrariness or capriciousness—even if a trust relationship exists—but we have consistently done so in other areas and have applied the same principle in Indian breach of trust claims brought in this court. *See Cheyenne-Arapaho Tribes v. United States,* 512 F.2d 1390, 1392, 206 Ct.Cl. 340, 345 (1975).[19]

### III

Defendant marshals a number of decisions in support of its argument that this court lacks jurisdiction over plaintiffs' monetary claims for breach of trust, but none of these citations is in point. In some, the court thought that there was no statute, treaty, agreement, regulation or order which could be read as establishing a trust

relationship or as imposing trust obligations—unlike the provisions of the General Allotment Act applicable here. *See Gila River Pima-Maricopa Indian Community v. United States,* 140 F.Supp. 776, 780–81, 135 Ct.Cl. 180, 187–89 (1956); *Gila River Pima-Maricopa Indian Community v. United States,* 427 F.2d 1194, 1198, 190 Ct.Cl. 790, 797–98, *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970); *Skokomish Indian Tribe v. France,* 269 F.2d 555, 560 (9th Cir. 1959); *Donahue v. Butz,* 363 F.Supp. 1316, 1320, 1323, 1324 (N.D.Cal.1973).

In others of defendant's "precedents," there was no statute empowering the particular court to grant the type of redress sought against the Government—unlike 28 U.S.C. § 1491 and § 1505, authorizing monetary relief in this court for claims founded on a statute such as the General Allotment Act. *See Naganab v. Hitchcock,* 202 U.S. 473, 475–76, 26 S.Ct. 667, 50 L.Ed. 1113 (1906); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 141–43, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *United States v. Eastman,* 118 F.2d 421, 423, (9th Cir.), *cert. denied,* 314 U.S. 635, 62 S.Ct. 68, 86 L.Ed. 510 (1941); *Harkins v. United States,* 375 F.2d 239, 240–42 (10th Cir. 1967); *Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe,* 370 F.2d 529, 531–32 (8th Cir. 1967); *Motah v. United States,* 402 F.2d 1, 2 (10th Cir. 1968); *Vicenti v. United States,* 470 F.2d 845, 847–48 (10th Cir. 1972), *cert. dismissed,* 414 U.S. 1057, 94 S.Ct. 561, 38 L.Ed.2d 343 (1973); *National Indian Youth Council v. Bruce,* 485 F.2d 97, 99 (10th Cir. 1973), *cert. denied,* 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). Most of these holdings concerned affirmative, non-monetary remedies, and for that

---

U.S.C. §§ 318a, 323–25 (1976) (concerning roads and rights of way); 25 U.S.C. § 162a (1976) (investment of tribal and individual Indian funds). Regulations have also been issued under most of these statutes.

**19.** Though we do not decide whether the statutes cited in note 18, *supra,* themselves create a trust relationship or other basis for jurisdiction, we do point out that there is undoubted jurisdiction in this court, aside from any trust relationship under those statutes, over the

claims in which plaintiffs seek to recover their own monies retained or deducted by the Government—unreasonable fees and service charges deducted for work performed by the defendant; improper deduction of road maintenance costs; and any other claims that the Government illegally kept some of the Indians' own money or property. *See Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1007–08, 178 Ct.Cl. 599, 605–06 (1967).

reason have little bearing on our topic of monetary relief. In all of this set of cases jurisdiction was sought to be laid under statutory provisions very different from section 1491 or section 1505 (or the District Court analogue to the Tucker Act, 28 U.S.C. § 1346(a)(2) (1976)). None of the decisions passed upon the scope of the latter consents-to-monetary-suits (or any statutes comparable to them).

The case in this court which defendant stresses is *United States v. Mescalero Apache Tribe,* 518 F.2d 1309, 207 Ct.Cl. 369 (1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). But that decision wholly revolved around the separate problem of the responsibility of the Government for payment of interest, and the existence *vel non* of statutes authorizing such payment in the circumstances then before the court. That subject matter is a far cry from most (though not all) of the claims in the present cases.[20] Nor did *Mescalero Apache Tribe* purport to pass, either in holding or in dictum, upon the jurisdictional question of the power of this court to entertain, under 28 U.S.C. §§ 1491 and 1505, the breach of trust allegations made by present plaintiffs.[21]

The upshot of our review of the prior holdings in this and other courts—called to our attention or of which we are aware—is that none suggests or calls for a denial of jurisdiction over the present proceedings. As shown in Part I, *supra,* our own earlier decisions sustain our power to consider plaintiffs' claims of breach of trust on their merits. For the reasons already given, defendant's current presentation has not moved us to alter that position.

The motion to dismiss for lack of jurisdiction is denied and the cases are returned to the Trial Division for further proceedings on the merits of the claims.[22]

**NICHOLS, Judge, concurring:**

I agree with and join in the court's decision except as specified. I add this concurrence largely because in *Navajo Tribe v. United States,* 586 F.2d 192 (Ct.Cl.1978), I expressed the view that the court was again taking entirely too lightly the doctrine of strict construction of the consent to be sued, that the dropping out of Indian moral claims from our jurisdiction if they accrued after August 13, 1946, was no small matter and could be decisive in our adjudication of many Indian suits, and referred to the instant *Mitchell* case, which I expected to be hearing soon, as an example where the change might make a difference. After full acquaintance with the briefs and listening to oral argument, I am convinced that the present claims are legal as distinguished from moral, in the sense of our jurisdictional constraints. The distinction between law and equity is now effectively abolished and an equitable claim is legal and within our jurisdiction, or at least not excluded merely because of being equitable in the historic sense, as a claim by a beneficiary against a trustee surely is. It is excluded only to the extent it demands other than money relief. If the United States declares itself by statute to be trustee of another's property, it assumes in my view an obligation to respond monetarily, in an action not sounding in tort, for maladministration of the property that deprives the beneficiary of its value. The standards of *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) and *Eastport Steamship Corp. v. United States,* 372 F.2d 1002, 178 Ct.Cl. 599 (1967) are met. The claim is founded on an Act of Congress. We are not to second guess the defendant's officials every time hindsight says they made mistakes, surely, but the precise standard of review remains to be determined.

---

**20.** With respect to interest, *Mescalero Apache Tribe* involved different statutes and periods of time from those with which the court was concerned in *Cheyenne-Arapaho Tribes v. United States,* 512 F.2d 1390, 206 Ct.Cl. 340 (1975).

**21.** *Mescalero Apache Tribe* came to this court on appeal from the Indian Claims Commission and was governed by the jurisdictional provi-

sions bearing on the authority of that Commission under the Indian Claims Commission Act. *See* 518 F.2d at 1314, 207 Ct.Cl. at 378.

**22.** It goes almost without saying that we intimate no position on the merits which are not at all before us. *See also* note 7, *supra.*

Many have misunderstood the decision in *United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889). It construed the newly passed Tucker Act (Act of March 3, 1887, 24 Stat. 505) which stated that the Court of Claims (concurrent with circuit and district courts respecting small claims) should have jurisdiction of "all claims" in specified categories "in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty, if the United States were suable." The plaintiff was suing for specific performance of a contract to sell land. The Court held, largely by reference to the provisions for payment of judgments, and out of inability to conceive this court telling the Executive Branch what to do, that the reference to equity extended the jurisdiction of this court to claims for money arising out of "equitable and maritime as well as legal demands," p. 18, 9 S.Ct. p. 671, the issuance of money decrees as well as money judgments, but did not provide for other than money relief. An equity court, in those days, might decree the payment of money, as a law court entered judgment. Thus clearly a suit in equity could have been brought here if its end as pursued was a money decree. Justices Miller and Field, dissenting, thought this even so gutted the statute, with which many since have agreed, but it did not deprive the "equity" language of all meaning. That would have been an unlikely thing for the Court of those days to do. The defendant in *United States v. Milliken Imprinting Co.,* 202 U.S. 168, 26 S.Ct. 572, 50 L.Ed. 980 (1906) made the same mistaken argument made here, that the Court of Claims had no equity jurisdiction, citing *Jones,* p. 169, 26 S.Ct. 572. The suit was to reform a contract and enforce it as reformed, which the Court of Claims had done, 40 Ct.Cl. 81 (1904). It held it had equity power to reform the contract. The Supreme Court affirmed (as to jurisdiction) through Mr. Justice Holmes, saying it was making "a fairly liberal interpretation of the Act," p. 173, 26 S.Ct. p. 573. The reference to courts of equity has now been removed by recodifiers from the Tuck-er Act, but this only reflects the end of courts of equity as separate institutions and has never been held to effect a reduction in the scope of the consent to be sued. Thus, if it will please the defendant, we can say the Indians here are suing, as they may, for a money decree instead of for a money judgment. Mr. Justice Holmes thought he was being liberal, and he would appear to have been somewhat out of sympathy with the doctrine of strict construction of the consent to be sued,.but in this instance he was only using the loophole carefully left open by the majority opinion in that non-pariel of strict construction decisions, *Jones v. United States, supra.*

I read our own decision in *Klamath and Modoc Tribes v. United States,* 174 Ct.Cl. 483, 488 (1966) as in accord with the foregoing, but categorizing a suit for an accounting as other than a claim for money. In the historical view, the decision may well be seen as an instance of very strict construction of the consent to be sued.

Defendant cites *United States v. King,* 395 U.S. 1, 2–3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) and *United States v. Testan,* 424 U.S. at 398, 403–04, 96 S.Ct. 948, 47 L.Ed.2d 114, for the proposition that relief, even money relief, would "entail the use of equitable jurisdiction which Congress has not seen fit to confer upon the Court of Claims." Brief at 19. It is true that some language in those two decisions, taken out of context, supports defendant's argument, but the context shows the Court was referring to "equitable jurisdiction" in the sense of other than monetary relief. The citation of *United States v. Jones, supra,* in *King,* 395 U.S. at p. 3, 89 S.Ct. 1501, shows that this is so. The modern Court, citing *Jones,* could not have overlooked that the *Jones* Court was interpreting a statute, the Tucker Act, that expressly conferred equitable jurisdiction, and nullified it only so far as construed to authorize other than monetary relief, reaffirming it within that limitation.

I should add that in concurring in the court's opinion, I do not include the proposition implied in the text for fn. 13 and ff. In my view, the doctrine of strict construc-

tion of the consent to be sued is relaxed little if at all by the fact, so far as it is the fact, that the claimant has no other remedy. No claimant can be said to be wholly without a remedy as long as Congress sits. Congress has always reserved, and still reserves, adjudication of many claims for itself, and historically, Indian claims have often been in that category. Statements by courts to palliate instances of strict construction as in *Klamath and Modoc, supra,* cannot alter that fundamental fact. The converse is true, that creation of a later remedy elsewhere may signal an intent to withdraw or revoke an earlier consent to be sued here, as in *Matson Navigation Co. v. United States,* 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932) (admiralty claims). The *Testan* reasoning referred to in fn. 13 is somewhat in that category. I deem the result here does not require that kind of analysis and is fully consistent with the doctrine of strict construction of the consent to be sued, whether or not the Indians have any other remedy under present law, short of Congress.