**CHEYENNE–ARAPAHO TRIBES OF INDIANS OF OKLAHOMA et al.**

v.

**The UNITED STATES.**

Nos. 342–70, 343–70.

United States Court of Claims.

March 19, 1975.

Pierre J. LaForce, Washington, D. C., for plaintiffs.

I. S. Weissbrodt, Washington, D. C., attorney of record for the Confederated Tribes of the Colville Reservation, and others; Weissbrodt & Weissbrodt, Ruth Duhl and Howard L. Sribnick, Washington, D. C., of counsel.

Glen A. Wilkinson, Washington, D. C., attorney of record for Cheyenne-Arapaho Tribes of Indians, and others; Wilkinson, Cragun & Barker, E. Foster De-Reitzes, Angelo A. Iadarola, Frances L. Horn, and Charles H. Gibbs, Jr., Washington, D. C., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Wallace H. Johnson, for defendant.

Before DAVIS, NICHOLS, and KUNZIG, Judges.

ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

These consolidated cases, before us on cross-motions for summary judgment as to liability, challenge the Government's performance of its fiduciary duties as trustee of funds belonging to various Indian tribes. The suits are brought on behalf of a number of tribes either for themselves or as representatives of large or aboriginal groups, but for the purpose of these motions the parties have agreed that two tribes for each

suit will be considered representative "test plaintiffs." No. 342–70 challenges the Government's management of judgment funds in the Treasury belonging to plaintiffs Southern Ute Tribe and Southern Ute Tribe as representative of the Confederated Bands of Ute Indians.[1] No. 343–70 challenges defendant's conduct with respect to other trust funds of plaintiffs Southern Ute Tribe and Hoopa Valley Tribe.

■ Both petitions allege that defendant breached its fiduciary duties in the care of plaintiffs' funds by not making the funds productive (by not investing moneys ready for investment and also by delay in making funds available for investment), by not maximizing the productivity of funds, and by using the funds to its own benefit and to the detriment of the tribes. It is clear from past opinions of this court and of the Supreme Court, and from the actions of both Congress and the Executive Branch, that funds appropriated to Indians to satisfy judgments of the Indian Claims Commission or of this court, as well as funds produced by tribal activities, are, when kept in the Treasury, held in trust for the Indians. *See* United States v. Mason, 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); Seminole Nation v. United States, 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); Menominee Tribe of Indians v. United States, 59 F.Supp. 137, 102 Ct.Cl. 555, 562 (1945); 10 Cong.Rec. 214 (1880) (statement of Senator Edmunds); S.Rep. No.1396, 70th Cong., 2d Sess. 1–2 (1929) (letter from Sec'ty of the Interior West); 34 Op.Atty.Gen. 439, 442 (1925). We have ruled that the United States as

trustee has undertaken an obligation "of the highest responsibility and trust," Seneca Nation of Indians v. United States, 173 Ct.Cl. 917, 925 (1965), an obligation doubly strict when the defendant, by retaining Indian moneys in the Treasury, in effect borrows those funds. Menominee Tribe of Indians v. United States, *supra*, 59 F.Supp. at 140, 102 Ct.Cl. at 562; *see* Navajo Tribe of Indians v. United States, 364 F.2d 320, 324, 176 Ct.Cl. 502, 507–08 (1966); Menominee Tribe of Indians v. United States, 101 Ct.Cl. 10, 19–21 (1944). We have also held that because the United States in effect imposes trust status on the Indian funds, our jurisdiction to review discretionary acts of the Secretaries of the Interior and of the Treasury in administering the trust is broad enough to cover the types of claims made here. *See* United States v. Seminole Nation, 173 F.Supp. 784, 789–90, 146 Ct.Cl. 171, 179–80 (1959); § 24 of the Indian Claims Commission Act, 60 Stat. 1049, 1055, 28 U.S.C. § 1505.

Test plaintiff Southern Ute Tribe is (or was during the relevant period) the beneficial owner of two judgment fund accounts, a proceeds of labor account,[2] a fourth principal account and five interest accounts held in the Treasury. The balances in the accounts at times totaled several million dollars. Even larger amounts were held in the accounts of the Consolidated Ute Tribes, represented here by the Southern Utes. The Hoopa Valley Tribe was the owner of a proceeds of labor account, the balance of which never fell below $1,000,000 from July 1964 to early 1970, and which at times held as much as $3,000,000, and an

---

1. The Confederated Bands of Ute Indians is an aboriginal grouping of Indians which exists for litigation purposes only. The Southern Ute Tribe is a constitutent of the group and eligible to share in awards to the Confederated Bands, *see* 25 U.S.C. § 676a (1970). Earlier in this litigation, defendant opposed the representation of the Confederated Bands by the Southern Utes. We hold that, by agreeing to accept the Southern Utes as a representative of the Confederated Bands as a test plaintiff, after our earlier refusal to dismiss the representative claim, defendant has waived its initial op-

position to this representation. *See* Trial Judge's Memorandum of Jan. 24, 1972 and the court's order of Sept. 29, 1972.

2. A proceeds of labor account holds "All miscellaneous revenues derived from Indian reservations, agencies, and schools * * * and not the result of the labor of any member of such tribe. * * *" 25 U.S.C. § 155 (1970). Since 1930, money held in the Treasury in proceeds of labor accounts has earned four percent simple interest. 25 U.S.C. § 161b (1970).

interest account to which interest on the proceeds of labor account was credited.

When Congress, in the exercise of its power over the Indians, determined by statute and by treaty to hold funds due the tribes in trust rather than immediately distributing them to the Indians, it also developed a series of investment policies for those funds. We are not faced here with a claim that Congress breached its trust duties under the Constitution or treaties. *See* Menominee Tribe of Indians v. United States, 101 Ct.Cl. 10, 21 (1944); *compare* Navajo Tribe of Indians v. United States, No. 256–69 (Ct.Cl., filed May 28, 1969) (alleged violation of Fifth Amendment in statutory provision for lower rate of interest on Indian funds than on other trust funds). Rather, plaintiffs urge that the Bureau of Indian Affairs has not properly used the tools Congress provided in order to meet the Government's fiduciary obligation.

The statutory scheme is that Indian trust funds deposited in the Treasury are to earn interest at the rate provided in the appropriate treaty or appropriations bill, and that if no interest rate is specified, the funds are to earn four percent simple interest per year. 25 U.S.C. §§ 161a, 161b (1970). In Menominee Tribe of Indians v. United States, 97 Ct.Cl. 158, 163–65 (1942), the court held that this provision prohibited the Treasury from paying interest on the interest earned by funds on deposit. *Cf.* Peoria Tribe of Indians v. United States, 390 U.S. 468, 473 n. 6, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968). Accordingly, the various interest funds owned by plaintiffs, when held in the Treasury, are totally unproductive. Defendant has in fact paid four percent simple interest on plaintiffs' other funds,[3] and if this were the limit of the Government's power, plaintiffs' claim, which does not attack the statutes, would have to fail.

However, holding the money in the Treasury is only one of defendant's statutory alternatives. Until 1880, tribal funds, rather than being deposited in the Treasury, were required by law to be invested, usually at a minimum rate of return of 5%. *See* Act of January 9, 1837, ch. 1, 5 Stat. 135, R.S. § 2096; Act of September 11, 1841, ch. 25, 5 Stat. 465, R.S. § 3659. Because of defaults on some bonds in which the Secretary of Interior had invested and due to declining interest rates, Congress provided by the Act of April 1, 1880, ch. 41, 21 Stat. 70, for the holding of moneys in the Treasury and payment of interest as an alternative to investment when the Secretary of Interior "is of the opinion that the best interests of the Indians will be promoted by such deposits, in lieu of investments." *See* 10 Cong.Rec. 213–15, 720 (1880); S.Rep.No.186, 46th Cong., 2d Sess. 1–2 (1880); F. Cohen, Handbook of Federal Indian Law 105 n. 210 (1942). Interest on Indian trust funds, where no rate was specified by the law or treaty setting up the fund, was set at four percent by the Act of Feb. 12, 1929, ch. 178, 45 Stat. 1164. In 1918, Congress clarified and limited the Secretary's power to invest rather than hold Indian funds by providing that the Secretary could withdraw Indian funds from the Treasury and place them in banks where such banks paid a higher rate of interest than the Treasury was obligated to give,[4] and he could also invest the funds "for the best interest of the Indians" in "any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States."[5] Act of

---

**3.** In one account of one of the test plaintiffs, 5% interest was paid.

**4.** Funds may be placed in commercial banks only when such banks provide either a bond or collateral in the form of United States public-debt obligations or "other obligations which are unconditionally guaranteed as to both interest and principal by the United States" to the extent funds deposited exceed deposits insured under the Federal Deposit Insurance Act. 25 U.S.C. § 162a (1970).

**5.** The most complete recent listing of bonds and notes eligible for investment under this provision is found in the opinion of the Associate Solicitor, Indian Affairs, dated May 3, 1968, Defendant's Exhibit 50.

May 25, 1918, ch. 86, § 28, 40 Stat. 591, as amended by Act of June 24, 1938, ch. 648, § 1, 52 Stat. 1037, codified at 25 U.S.C. § 162a (1970).

■ It is therefore legally possible, depending on the state of the market, for the Secretary, by investing rather than holding Indian funds, to provide the Indians with more than 4 percent simple interest. Because the investments are required by statute to be either heavily collateralized (in the case of bank deposits) or guaranteed by the Government, safety is not an issue. Moreover, because of the existence of a secondary market in many of the permitted investments (*e. g.* Treasury bills, Federal Home Loan Bank Board notes, Federal Intermediate Credit Bank notes, etc.), sudden requirements for cash do not present major obstacles to these types of investments.[6] The four percent attainable by retaining the funds in the Treasury is, as another court has stated, a floor rather than a ceiling. Manchester Band of Pomo Indians, Inc. v. United States, 363 F.Supp. 1238, 1243–44 (N.D. Cal.1973).

■ The fiduciary duty which the United States undertook with respect to these funds includes the "obligation to maximize the trust income by prudent investment," and the trustee has the burden of proof to justify less than a maximum return. *See* Blankenship v. Boyle, 329 F.Supp. 1089, 1096 (D.D.C. 1971). *See also* Restatement of Trusts 2d § 181 (1959). A corollary duty is the responsibility to keep informed so that when a previously proper investment becomes improper, perhaps because of the opportunity for better (and equally safe) investment elsewhere, funds can be reinvested. While the trustee has a reasonable time in which to make the initial

investment or to reinvest, he becomes liable for a breach of trust if that reasonable time is exceeded. Restatement of Trusts 2d §§ 231 and comm. b, 181 and comm. c (1959).

This is the general law governing the Government's duty and responsibility toward the Indian funds involved in this case. The real problem arises when we attempt, on these cross-motions for summary judgment, to decide precisely to what extent there was in these cases a breach of those obligations. The essence of plaintiffs' assertions is that defendant failed to make their trust funds as productive as legally and practically possible. But the method the parties have chosen to present to the court this complicated question makes it wellnigh impossible to give any definitive answer at this time. The motions for summary judgment are accompanied by great masses of documentary materials which the parties have mechanically collated but which they have not meaningfully correlated to the ultimate issues of breach of fiduciary duty. The court was left to wander and wallow, for itself, in this morass of documentation without helpful guidance, sorting out, agreement of the parties on specified segments of the evidence, or precise findings. Moreover, we were told at the bar that the litigants did not consult the trial judge to determine whether he felt that it was appropriate to dump the entire problem in the court's lap or whether he could simplify and speed the process of determination by a full or partial trial on liability. In these circumstances and in a matter of this magnitude and complexity, we think that it was inappropriate to use the mechanism of summary judgment, in the gross form in which the parties availed themselves of that procedure, as the primary means of initial de-

---

**6.** It is unclear whether the Treasury, through which defendant now purchases securities, can or does act as a broker for secondary market purchases. However, we find nothing in the statutes or legislative history to indicate that defendant may not purchase or sell eligible securities in the secondary market when doing so would enhance yield or liquidity. If the

Treasury cannot act for defendant in that market, 25 U.S.C. § 160 (giving the Treasury custody over Indian securities), which was enacted solely as a housekeeping measure after an Interior Department fire, 10 Cong.Rec. 720 (1880), does not preclude use of a commercial broker where fees are reasonable. *See* 4 Cong.Rec. 617, 638, 881, 1394 (1876).

termination. Nevertheless, now that the motions are before us and have been argued and considered, we shall not delay the proceedings by simply returning the case to the trial division without any decision. We shall, instead, make use of our Rule 101(e) which permits us to decide that certain material facts are not substantially controverted and to decide those subordinate legal issues we can determine on the present record.

For these reasons, we have concluded that we are in no position at this time and on the present record to give a complete answer, although we can decide several specific points (to be listed *infra*). There must be further proceedings in the trial division which will refine exactly what the Government should have done. We shall leave to the trial judge the determination of the maximum return available during the period at issue,[7] of the reasonable periods the Government had to consider what to do and then to do it, and of the various defenses and argument defendant may raise (except those we reject in this opinion).

 In assessing the return available outside of the Treasury, both in the earlier segment of the period and later, the trial judge should take into account the availability of eligible investments through the secondary markets as well as directly from the issuer. He will, in addition, have to decide the length of time within which it would have been reasonable for defendant to make funds available for investment, to make actual investments, and to reinvest where appropriate.[8] As to funds which were invested, but at rates less than those found by the trial judge to be the maximum available, the trial judge will have to determine whether defendant breached its duties by not making a switch in investments which would have been made by "a man of ordinary prudence * * * in dealing with his own property."[9] Restatement of Trusts 2d § 174 (1959).

 There are, as already indicated, several specific points on which we can now rule definitively. We have already pointed out (note 5, *supra*) that the Associate Solicitor of the Interior Department has listed the bonds and notes eligible for investment as public-debt obligations of the United States and securities guaranteed by the United States. Since defendant does not contest the correctness of its own attorney's opinion, we hold that at least twelve of the obligations listed by him must be considered legal alternate investments for trust funds.[10]

7. Obviously, there will not be one maximum for the entire period, nor for all lengths of investments. The trial judge may wish either to fix a maximum yield for each of several terms of investment for each of several smaller periods of time, or to determine for which periods and for how long funds were available and then find the maximum only for those periods and terms. In the absence of any suggestion by the parties how a maximum is to be determined, either method suggested above, or some other appropriate system, appears proper.

8. While most of the actions complained of in this suit were those of the Bureau of Indian Affairs, defendant cannot escape responsibility merely by showing that another department of the government, *e. g.* the Treasury or the Office of Management and Budget, caused any needless delay or mismanagement. *See* Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (one part of government responsible for promises of another).

9. In fixing damages, it will be necessary for the trial judge to make some determination as to the term for which funds were available for investment. In the absence of a showing by defendant of specific immediate budgetary commitments by the tribes, claimed liquidity needs should be considered in the light of the actual history of the tribes' funds. *See* Blankenship v. Boyle, 329 F.Supp. 1089, 1096 (D.D.C.1971).

10. These twelve are as follows:
 1. Export-Import Bank participation certificates.
 2. Federal National Mortgage Association participation certificates issued pursuant to 12 U.S.C. § 1717(c) (1964), as amended (Supp. II, 1965–66).
 3. All other obligations, participations, or other instruments of the Federal National Mortgage Association by authorization in 12 U.S.C. § 1723c (1964).
 4. Debentures of the Federal Housing Administration issued pursuant to 12 U.S.C. § 1710(d).

■ Secondly, defendant says that any failure in productivity was due to its policy of consulting the Indians before investing and the plaintiffs' failure to respond to its requests for advice. Our ruling is that while such consultation may have been a useful part of defendant's overall policy to make the Indians ready for dissolution of trust status, the Government was duty bound to make the maximum productive investment unless and until specifically told not to do so by a tribe and until defendant also made an independent judgment that the tribe's request was in its own best interest. We find no evidence in the present record of such requests in the case of any of the test plaintiffs.

Third, defendant argues that more productive investments were not available during the earlier part of the period. Defendant has stipulated to the contrary at least from May 10, 1965 onward, see Joint Stipulation of Facts No. I, paras. 9–10, so that the only period for which plaintiffs are claiming about which there may be disagreement on this issue is July 1, 1964 to May 10, 1965. If defendant continues to press this point, the matter of the availability of more productive returns in the earlier segment of the period in suit should be gone into further.

■ Fourth, on those funds which defendant in effect borrowed from plaintiffs by retaining them in the Treasury, we hold defendant to a strict standard of fiduciary duty—if eligible investments were available at higher yields, defendant will be liable to plaintiffs for the difference between what interest defendant paid for the funds and the maximum the funds could have legally and practically earned if properly invested outside.

Fifth, we find that, except possibly for the earliest period, there were in fact, at all relevant times, proper sources of investment outside the Treasury which would have yielded higher returns than 4%. As already indicated, we do not determine the length of the reasonable periods in which the Government should have acted or the validity of its possible excuses, if any, for failing to act at all or in due time (other than those dealt with in this opinion).

■ Sixth is the problem of the interest accounts on which no interest was paid at all. Defendant's own exhibits show that as early as 1963 the unproductive interest funds of both the Chemehuevi and Hoh tribes were withdrawn from the Treasury to earn interest in commercial banks—a policy defendant encouraged. See Defendant's Exhibit 50. Since defendant had available at all relevant times outside investments which would have yielded some substantial return, we hold that the Government is liable for lost profits on those interest accounts.

■ Finally, in determining the maximum rates available, the trial judge will disregard the advice the Bureau of Indian Affairs received from the Office of

5. Farm loan bonds issued by federal land banks, 12 U.S.C. § 941.
6. Obligations of the Federal Home Loan Banks, 12 U.S.C. § 1435.
7. Debentures of the Federal Intermediate Credit banks, 12 U.S.C. § 1045.
8. Debentures of the banks for cooperatives, 12 U.S.C. § 1134m.
9. Bonds, notes, and other evidences of indebtedness of the Tennessee Valley Authority, by authorization in 16 U.S.C. § 831n–4.
10. Notes guaranteed as to principal and interest by the Small Business Administration pursuant to 15 U.S.C. § 683(b).
11. Bonds issued by local housing authorities secured by annual contributions contracts with the United States.

12. Bonds or notes of local housing and urban renewal authorities secured by a contract or requisition agreement with the United States.

The Associate Solicitor's opinion also mentions several types of commercial paper backed by United States insurance and loan guarantees, the purchase of which would appear to require participation in the substantive activity underlying the obligation (e. g., shipbuilding) and which may not, therefore, be proper investments. Plaintiffs, on remand, will be free to prove that these or any other securities are proper investments under section 162a, but defendant will be held to have admitted that the twelve types of securities listed above are proper.

Management and Budget (OMB) that it might not invest in Government-guaranteed securities of certain agencies. That advice was based on internal accounting policies of the OMB, and was in clear derogation of defendant's statutory right to invest in those securities,[11] a right recognized by the Department of the Interior at least since 1966, but disregarded in the face of OMB pressure. *See* Defendant's Exhibits 13, 13A, 4, 5; Plaintiff's Exhibit 1.

On these grounds, we make under Rule 101(e) the orders specified above and return the case to the trial division for further proceedings under and consistent with this opinion, see Rule 101(e) and Rule 131(c)(2).

NICHOLS, Judge (concurring):

I concur in Judge Davis' opinion. I would like, however, to stress, even more strongly than he does, the utter inappropriateness of invoking our summary judgment procedure in this case at this juncture, with the hope that no one will copy plaintiffs' measures in future cases.

In my opinion, the procedure in Trans Ocean Van Service v. United States, 426 F.2d 329, 192 Ct.Cl. 75 (1970), after Rule 131(c) proceedings 470 F.2d 604, 200 Ct.Cl. 122 (1972) shows how, within the present Rules, a multiplicity of separate claims can be handled even though they involve a complex cross entangling of numerous legal and factual issues, as I think these claims do.

I went to the oral argument in this case, after spending much time with the briefs and record, in a state of utter perplexity as to what useful action we could possibly be expected to take. I asked plaintiffs for a draft order in hopes of getting light as to this. With his greater wisdom, Judge Davis has managed to salvage something of value out of an exercise I expected to be a total loss.

In general, a judgment is a pronouncement by the court as to the legal consequences of established facts. A roving pronouncement of the law supposedly applicable to a case, independent of the facts, is not a judgment of itself, and a motion for summary judgment is not an appropriate means of eliciting such a pronouncement, supposing it is appropriate for the court to make it. A motion for summary judgment under Rule 101(a) is not an appropriate means to use in good faith for eliciting a partially dispositive order under Rule 101(e) even though, as here, such an order may sometimes be the result. The filing of a motion for summary judgment suspends the jurisdiction of the trial judge per Rule 14(b)(2), whereas this case is, of all others, one where the services of a trial judge are most needed. At present, our clerk has no option to do anything with cross motions for summary judgment except to calendar them for argument before a panel of judges. And finally, our trial division has many important functions besides conducting trials. For one thing, a pre-trial conference under Rule 111 may be an appropriate means of settling on further procedural steps, and perhaps even avoiding a trial. Parties should consider the operational effect of the moves they make.

11. The legislative history of 25 U.S.C. § 162a plainly shows that the statute was designed to allow investment in precisely those types of agencies, e. g., the Home Owners' Loan Corporation and the Federal Farm Mortgage Corpo- ration, which the OMB memorandum disallowed, S.Rep.No.531, 75th Cong., 1st Sess. 2 (1937); H.Rep.No.1192, 75th Cong., 1st Sess. 2 (1937); S.Rep.No.1630, 74th Cong., 2d Sess. 2 (1936).