**Helen MITCHELL, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 772–71, 773–71, 774–71, 775–71.**

United States Claims Court.

Oct. 30, 1987.

As Corrected Nov. 13, 1987.

Charles A. Hobbs, Washington, D.C., for plaintiffs. Jerry C. Straus, Marsha Kostura, and Hobbs, Straus, Dean & Wilder, Washington, D.C., of counsel.

Edward J. Passarelli, with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant. Arthur Biggs and Richard DeClerck, Dept. of Interior, Portland, Or., of counsel.

## OPINION

WIESE, Judge.

In an opinion entered in this case on May 22, 1986, *Mitchell v. United States*, 10 Cl.Ct. 63, *modified on reconsideration*, 10 Cl.Ct. 787 (1986), this court addressed the application of the statute of limitations to claims brought by allottees of the Quinault Indian Reservation alleging mismanagement of their forest resources by the United States, the statutory trustee (acting through the Bureau of Indian Affairs ("BIA")). The opinion focused chiefly on the two principal claims the allottees shared in common—collectively, the "Stumpage Claims" and the "Regeneration Claims." The stumpage claims involved the allottees' contention that they had failed to receive fair market value for the Reservation timber harvested between 1920 and the current date under two long-term logging contracts—the Taholah and Crane Creek contracts. The regeneration claims addressed the related contention that the Secretary of Interior had failed to manage plaintiffs' timber in accordance with the forestry practices necessary to achieve the "sustained-yield management" prescribed by 25 U.S.C. § 466 (1982).

Upon examination of the facts in light of the applicable law, it was concluded that plaintiffs' arguments in favor of a tolling of the statute of limitations could not be upheld; hence, the claims were held to be actionable only to the extent they addressed discrete wrongs occurring within six years of the time that suit was filed. In the case of the stumpage claims, this meant that only timber harvested after October 18, 1965 was open to challenge under a claim of inadequate pricing. Similarly, with regard to the regeneration claims, it was concluded that, in light of the Secretary's statutory duty to manage the allottees' timber on a sustained yield basis, the duty to replant was necessarily an ongoing one; hence, the failure to honor that duty after October 18, 1965 was actionable irrespective of when the timber had actually been harvested.

The present proceeding is a continuation of the prior decision in the sense that we again take up the application of the statute of limitations—this time focusing upon the remainder of the allottees' claims of trust mismanagement. Included among these secondary matters are claims alleging that the BIA collected unreasonable fees from the allottees in connection with the Government's administration of their timber resources,[1] collected inadequate fees from the logging companies for the private use of roads crossing the allottees' lands, mishandled various Indian money accounts, and, finally, failed to protect fishing waters from damaging logging practices.

As before, the timeliness question has been raised by defendant's motion for summary judgment and plaintiffs' opposition thereto. In the discussion that follows, we assume familiarity with the background facts set forth in the earlier opinion; they shall not be repeated here. However, to facilitate the present discussion, we sketch again the legal analysis that shaped the prior result.

## I.

### THE LAW

█ The statute of limitations that is applicable to proceedings in this court, 28

---

1. This claim, descriptively titled the "Excessive Administrative Fees Claim," was abandoned by plaintiffs, to the extent it applies to pre–Oct. 18, 1965, during the argument of the case on July 9, 1987. We have listed the claim in this opinion only for the sake of completeness of the record.

U.S.C. § 2501 (1982), states that "[e]very claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." For purposes of the statute, a claim first accrues when all events have transpired that "fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." *Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 240, 368 F.2d 847, 851 (1966). The statute is jurisdictional—that is to say, it signifies a time-limited waiver of sovereign immunity —and, for that reason, must be narrowly defined. *United States v. Mottaz,* 476 U.S. 834, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986); *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273, 1 L.Ed.2d 306 (1957).

■ The running of the statute of limitations is measured from the time of first accrual in all cases save those where the events that occasion a redressable injury could not have been uncovered in the exercise of due diligence. Thus, tolling of the limitations period is justified only where the facts underlying a wrong have been deliberately concealed, *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 347–48, 22 L.Ed. 636 (1874), or where the facts are inherently unknowable at the time the injury first occurs. *Urie v. Thompson,* 337 U.S. 163, 169, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949). Moreover, the law assumes that "the means of knowledge are the same thing in effect as knowledge itself," *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807 (1879), thus, only blameless ignorance can suffice to relieve a party from the operation of the statute of limitations.

These rules apply with like force to Indian cases, including situations such as this one where the United States stands in the position of a statutory trustee. *Menominee Tribe of Indians v. United States,* 726 F.2d 718, 721 (Fed.Cir.1984), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1985). Consequently, the clock begins to tick on the claims of an Indian beneficiary when he knows or reasonably should know of the Government's breach of duty. *Jones v. United States,* 801 F.2d 1334, 1335 (Fed.Cir.1986). The test is the same whether the claim involves mismanagement of trust lands or misappropriation of trust money. *Menominee Tribe,* 726 F.2d at 721; *Capoeman v. United States,* 194 Ct.Cl. 664, 666–68, 440 F.2d 1002, 1003–04 (1971).

Applying these principles to plaintiffs' stumpage claims, we found that the allottees had sufficient facts to suspect they were receiving an inadequate return for their timber long before they brought suit here. In fact, accusations that the Government was guilty of gross mismanagement of timber sales were made directly, repeatedly, publicly and emphatically: in two separate congressional hearings in 1955 and 1957, in numerous local newspaper reports, and in a newsletter written by an Indian advisory committee and mailed to the other allottees. In particular, that newsletter warned: "It is up to you, the Indian allottee of this reservation, to help us break this white collared monopoly, and help us cut this BUREAUCRATIC red tape that the two [logging] companies are strangling us with now." (Original text.)

On the basis of this record, the court was compelled to conclude:

Certainly by, say, mid–1958, enough words had been aired to have brought home to even the most unsophisticated among them [the allottees] an awareness that perhaps not all was right in the Government's management of the Reservation timber. Further action was then clearly called for—the hiring of a lawyer, for example—and from that event one can assume would have followed what eventually did come about (though not until many years later) namely, the revelations that are the content of the present suits. [*Mitchell,* 10 Cl.Ct. at 71.]

Therefore—the court further concluded— plaintiffs not only had actual notice of their stumpage claims by 1958, but constructive notice of all factually related claims, such

as high-grading,[2] pick-up scale,[3] and cost allowances. These last involved matters having a direct and immediate bearing upon the amount of money the allottees received for their timber; hence, the disclosure of the facts underlying these claims was seen by the court as "the logical outgrowth of an investigation of stumpage prices in general." *Id.* at 71.

## II.

### THE SECONDARY CLAIMS

Plaintiffs now ask the court to limit the previous holding by charging the allottees with constructive notice only of those facts directly related to timber prices. They contend that even if factually-related claims could have been discovered through a diligent investigation of stumpage prices, none of the secondary claims now at issue share any immediate connection with timber revenues and are, therefore, beyond the compass of the constructive notice doctrine. Essentially, the argument is that plaintiffs were excusably ignorant of all matters not directly related to the determination of the income they received from the sale of their timber. In addition, plaintiffs contend that certain of the secondary claims should be treated as continuing claims, similar to the regeneration claims, because they involve alleged breaches of a ongoing duty to act. Because each of the secondary claims raises discrete issues, we address each in turn.

### Road–Use Permit Claims

Under the Taholah and Crane Creek contracts, the logging companies were responsible for constructing and maintaining the road system necessary for hauling logs out of the forest. The costs involved in this effort were recovered by the loggers through road-cost allowances charged against the stumpage payments due the allottees upon the harvesting of their timber. On occasion, however, the logging companies purchased allotments from the Indian owners with a view to harvesting the timber for their own account. In these situations, the allotments involved were released from the terms of the logging contracts. This meant that the companies had to construct the necessary timber-haul roads at their own expense. In addition, the companies were required to obtain rights-of-way in their own behalf in order to haul their logs across the Indians' allotments. This last is the matter that concerns us now.

The BIA's practice of issuing long-term revocable road-use permits to allow the logging companies to haul timber across the allottees' lands began in 1959. An allottee whose land was so affected received a flat fee, generally $50, for the grant of the right-of-way, and the lumber company assumed the responsibility for maintaining the right-of-way for the period of use allowed—typically, for the remaining term of the existing logging contract. The argument plaintiffs make is that these rights-of-way should have been valued on the basis of the volume of logs hauled across the land, rather than in a single lump-sum payment. The former, they say, represents the conventional manner in which such permits were valued in the local area. Plaintiffs contend that they were shortchanged by the BIA's valuation approach, and therefore the Government breached its duty under 25 U.S.C. § 325 (1982) to secure fair compensation for grants of right-of-way.

Inasmuch as these alleged wrongs occurred, for the most part, before October 1965, they fall outside the six-year limitations period. However, plaintiffs argue

---

**2.** "High-grading" identifies the practice, followed by the logging companies during the early years of their contracts, of initially selecting only the better grade timber for harvesting while leaving the lesser grades for last. Plaintiffs' high-grading claim grew out of the fact that the BIA adopted a mid-term change in timber pricing policies that ignored the fact that the lumber companies had initially recovered the better grade timber while paying only a market-average price. This claim is more fully discussed in the earlier opinion. *Mitchell,* 10 Cl.Ct. at 66.

**3.** The pick-up scale claim concerned the BIA's alleged failure to scale (*i.e.,* to measure) and charge for all merchantable timber the logger failed to remove from the harvest site. The claim focused on the unrecovered value of the timber that was left behind after logging operations had moved on to another cutting area.

that they were excusably ignorant of the road-use permit claims. They point out that the adequacy of the compensation received by the allottees for the use of their roads was not a subject of concern during the congressional hearings—indeed, the issuance of rights-of-way over Indian lands was an infrequent practice prior to 1959— and the allottees were not otherwise caused to question the fairness of the road-use permit fees until long after the organized investigation of their stumpage claims had begun. In short, the argument is that, as trust beneficiaries, plaintiffs were entitled to assume that the Government was tending to their affairs in a proper manner—at least until there were some discernible indications to the contrary.

The Government sees the situation much differently. The allottees, defendant points out, were not left in the dark as to how their right-of-way values were determined. Rather, each allottee was provided information showing the acreage involved in the right-of-way, the appraised valuation per-acre and the resulting value for the right-of-way. Accordingly, the allottees had before them all the essential details of the transaction. Moreover, the Government adds, evaluation of this information demanded no specialized skills, for it was plain to see that the fee for the right-of-way was determined on the basis of the underlying land value. Thus, from the Government's point of view, plaintiffs long had in hand the factual details they now point to as evidence of trust mismanagement. And on that ground, then, the Government maintains that plaintiffs have failed to make out a case of excusable ignorance.

█ The court agrees with the Government's position. As was pointed out earlier, the statute of limitations applies with no less force to the Indian beneficiary of a statutory trust than to the ordinary citizen in litigation with his Government. Thus, a tolling of the statute of limitations on grounds of excusable ignorance demands, in the first instance, a demonstration of diligence on the part of the allottees in the protection of their interests. "A general

allegation of ignorance at one time and of knowledge at another are of no effect." *Wood*, 101 U.S. (11 Otto) at 140. And that is precisely the problem here.

We have not been told why a cause of action based on events beginning, in some cases, as early as 1959 should have lain dormant until 1971. The point was made during the oral argument that comprehensive disclosure of the details of the road-use permit fee valuations was not provided in every case; some allottees, the court was advised, were barely told more than the basic nature of the transaction for which their signature authorization was being requested. But this last point, even if true, does not overcome the problem. The fact is that the necessary information would have been made available had it been asked for; not to have asked for it can hardly satisfy the demand for diligence. Given the record we have, it must be concluded that the road-use permit claims which occurred before October 1965 are time-barred.

In an attempt to avoid this result, plaintiffs argue that even if they are held to have been constructively on notice of their road-use permit claims before 1965, the Government, nevertheless, had a continuing duty to collect proper tolls from the logging companies as timber was hauled over the allottees' lands. This duty, plaintiffs assert, is analogous to the Government's ongoing duty to regenerate the forest according to the principles of sustained-yield management as prescribed by 25 U.S.C. § 466. Therefore—the argument continues—just as every post–1965 failure to replant trees gave rise to a new cause of action, so too does the Government's alleged failure to collect adequate compensation on each occasion, after October 1965, that existing rights-of-way were used to haul non-Indian timber across the Indians' land.

Plaintiffs attempt to find the Government's ongoing duty to collect tolls in 25 U.S.C. § 325 (1982), which provides that "[n]o grant of a right-of-way shall be made without the payment of such compensation as the Secretary of the Interior shall deter-

mine to be just." However, unlike § 466, which specifically prescribes sustained yield management and hence an ongoing Governmental duty of forest regeneration, the duty to secure compensation for a right-of-way arises only once—at the time the right-of-way is granted. *See Coast Indian Community v. United States*, 213 Ct.Cl. 129, 156, 550 F.2d 639, 654 (1977). There is no requirement that such compensation be obtained through an ongoing collection of tolls, as opposed to a single, lump-sum fee. Therefore, plaintiffs' road-use permit claims are not continuing claims and cannot escape the consequences of the statute of limitations.

As a final alternative, plaintiffs argue that because federal regulations give the Government the power to revoke road-use permits under certain circumstances, the Government had a duty to do so as soon as conditions made revocation possible. The applicable regulation, 25 C.F.R. § 169.20 (1986), provides that, for certain enumerated causes, "[a]ll rights-of-way granted under the regulations in this part *may be terminated* in whole or in part." (Emphasis added). Among those causes is the nonuse of the right-of-way for a period of two consecutive years. § 169.20(b). Plaintiffs contend that the logging companies failed to use some rights-of-way for two consecutive years, and therefore the Government had a duty to revoke those permits so that fair compensation could then be obtained upon the issuance of new permits.

The flaw in this argument is that § 169.-20 does not make revocation of road-use permits mandatory, but discretionary. Termination is required only after the Government decides to give notice and the nonuse of the road continues for another 30 days. *Id.* The Government was not under any mandatory, ongoing duty to revoke road-use permits as soon as such action might become legally permissible. Therefore, non-revocation of the permits may only be viewed as an exercise of discretion and not as a breach of an ongoing duty giving rise to a continuing claim.

*Aloha Mainline Road Claims*

The Aloha Mainline Road is an Indian service road that serves as the chief access route for a large portion of the Quinault Reservation. The road traverses land that originally served as a railroad grade in the transportation of timber from contract logging units located in the southern portion of the Reservation. After these logging contracts were completed, the necessary rights-of-way for the railroad grade also came to an end.

In the 1940s, the Government converted the grade into a truck road, and, in 1950, it designated the road as an Indian service road to be used principally for fire protection and access. Although the facts are not entirely clear on the point, it appears that the allottees involved gave their consent to this limited use of the road. Thereafter, however, the Government treated the Mainline Road as a full-access public road and permitted the Aloha Lumber Company to use the road to transport, without compensation to the landowners involved, the bulk of the timber then being harvested under the Taholah contract. (The Mainline Road is located outside the Taholah Unit and is, therefore, not covered by the rights-of-way granted under the Taholah contract.)

In the claim before us, plaintiffs seek compensation for what they say is an unauthorized use of their property. Plaintiffs contend that the Government unlawfully took the rights-of-way for public use of the Mainline Road without consent and, in addition, failed to collect proper tolls on behalf of the affected allottees from the logging company. And, in each instance, they argue, the allottees were excusably ignorant of their claims because the Aloha Mainline Road was not a subject of attention in the 1956 and 1957 congressional hearings or otherwise the focus of public discussion.

The Government argues that plaintiffs are not entitled to be heard on their claims at this late date. Says the Government, "[i]t is clear from the facts presented in this case that prior to October 18, 1965, each plaintiff whose land was crossed by the Aloha Mainline Road was on inquiry as

to the nature of this roadway and whether plaintiff was to receive compensation for this roadway."

■ The Government is correct. The facts make clear that use of the Mainline Road by the Aloha Lumber Company was a matter of concern to some of the allottees involved as early as 1958. Indeed, one such allottee, Charles Wain, had threatened to enforce his ownership claim to the property by blocking the road. The Government responded to this proposed action by advising Mr. Wain—as it had other concerned allottees pursuing the same subject—that dedication of the road to public use was a matter within its authority. Specifically, by letter of March 31, 1958, the Superintendent of the Western Washington Agency informed Mr. Wain that "[r]oads on the reservation road system were long established by the Government under the plenary power of the Government in the management of Indian Affairs as Indian reservation roads and also under the authority of the Act of Congress of May 25, 1928 (45 Stat. 750)." The Superintendent's letter went on to say that, for many years, the United States had expended public funds for the maintenance and improvement of the roads on the reservation system, and therefore he (Mr. Wain) had "no legal right to block the road, and if you do so, the United States will have to take appropriate steps to present the matter to the Department of Justice for necessary actions against you."

Judging from later correspondence on this same subject, Mr. Wain remained undaunted by the Government's views on the matter. Roughly a year later, in a letter of February 16, 1959, the assistant director of the Portland Area Office had occasion to advise the Superintendent of the Western Washington Agency that, concerning the Aloha Mainline Road, "[i]t was reported that Mr. Charles Wain is seeking the support of other allottees for the purpose of bringing suit for damages against the Aloha Lumber Corporation." For reasons this record leaves unexplained, the contemplated lawsuit was never brought.

And it is now too late to do so. The Government's position concerning its rights in the Aloha Mainline Road—made apparent by the unrestricted public use that it insisted upon—could not have escaped the attention of those allottees whose lands the road traversed. Given the record before the court, it must be presumed that, like Charles Wain, they chose not to press the matter. That ends the controversy.

Plaintiffs argue, however, that their right to compensation for the public use of the Aloha Mainline Road is a continuing claim and therefore they are entitled to recover payments, in the form of a toll for haul, for the road use occurring within the six-year period of the commencement of this suit.

The court rejects this contention. A continuing claim to compensation presupposes that the allottees have retained an interest in the property sufficient to exclude its use by others. That is not the case. It is apparent from the previously-quoted letter to Mr. Wain of March 31, 1958, that the Government saw itself as having acquired a permanent right of unrestricted use of the road in consequence of the past expenditures of public funds in the improvement of the road. Whether the Government was correct in this position does not matter. What does matter is that plaintiffs were put on notice that the United States was asserting a possessory right to the use of the road inconsistent with their own claims of ownership. From plaintiffs' point of view, then, they not only faced a breach of trust on the Government's part, but more importantly, the potential loss of the exclusive property interest they alleged in the Aloha Mainline Road. Short of an administrative resolution of the matter (which obviously was not forthcoming), plaintiffs' only recourse was a lawsuit. But that lawsuit, whether it had been cast as an action to quiet title or as a suit for an uncompensated taking, is now timebarred. *See United States v. Mottaz*, 106 S.Ct. at 2233–34. Accordingly, plaintiffs are foreclosed from asserting any interest in the Aloha Mainline Road inconsistent with the right of free public use claimed by the United States.

*Tribal Judgment Fund Interest Claim*

On July 9, 1962, the Indian Claims Commission approved a compromise settlement awarding the Quinault Tribe a judgment of $205,172.40. *Quinaielt Tribe v. United States*, 10–B Ind.Cl.Comm. 411 (1962). Funds were appropriated by Congress for payment of this judgment in early 1964 and thereupon the required amount was placed on deposit in the United States Treasury to the credit of the Quinault Indians. With respect to such funds, 25 U.S.C. § 161a directs that they earn simple interest at the rate of 4 percent per annum.[4] However, pursuant to § 162a, such funds could be withdrawn by the Secretary of the Treasury for placement in certain approved outside investments whenever the return thereby obtainable would be greater than the statutory interest rate payable on the funds being held in the Treasury.

Plaintiffs' contention is that they failed to obtain the benefit of these statutory entitlements. They point out that, for the period from January 6, 1964 to January 1965, no interest was credited to their account; and from January 1965 to March 1973, they received only 4 percent simple interest, credited semi-annually (with the interest being deposited in non-interest bearing accounts) while, starting roughly May 1965, the approved investment market outside the Treasury offered returns greater than the statutory 4 percent minimum. It was only after March 1973 that the Government changed its investment strategies so as to secure for plaintiffs what they consider a reasonable market return. Plaintiffs claim that they are entitled to recover the "shortfall" in earned interest that occurred between January 1964 and March 1973.

The only portion of this claim that need concern us now is the period from January 1964 through October 18, 1965. As to the remainder, the statute of limitations poses no problem since the transactions involved all occurred within six years of the time suit was brought in this court.

Concerning the first part then, plaintiffs argue that the Secretary's failure to earn the prescribed and allowable rates of interest on their judgment fund violated a continuing duty to make the trust funds productive. And because of this continuing duty, they further say, for limitations purposes, their cause of action did not accrue until March 1973, that is, when the wrong finally ended.

In addition to their continuing wrong argument (or, more accurately, as an alternative to that argument) plaintiffs contend that they were never put on notice of the initial delay in the crediting of interest on the judgment fund (from January 1964 through January 1965) or of the Secretary's determination thereafter not to pursue a more aggressive investment policy. "Once funds to satisfy the judgment had been appropriated by Congress," say the plaintiffs, they "understandably, and rightfully, took for granted that statutory interest would be credited from the date the fund was deposited in the Treasury."

The claim does not require an extensive analysis. The court's views in regard to plaintiffs' continuing wrong argument were fully stated in the earlier opinion, *Mitchell*, 10 Cl.Ct. at 73–76, and shall not be repeated here. Suffice it to say that we consider the continuing wrong theory analytically inappropriate to the claims presented in this litigation.

■ And as to the alternative argument, that too must fall on deaf ears. What dooms the claim is the fact that, contrary to the Tribe's assertion here, it did, indeed, have notice of the interest (or more specifically, the lack thereof) credited to the judgment funds being held in the Treasury. That information, as the Government's supplemental submissions show,[5] was brought

4. The applicable statute, 25 U.S.C. § 161(a) (1982) reads as follows:

    All funds with account balances exceeding $500 held in trust by the United States and carried in principal accounts on the books of the Treasury Department to the credit of Indi-

an tribes, upon which interest is not otherwise authorized by law, shall bear simple interest at the rate of 4 per centum per annum.

5. Following oral argument of the present motions for summary judgment on July 9–10, 1987, defendant was permitted to supplement its mo-

home to the Tribe through the BIA's regular monthly transmissions of tribal operating statements, *i.e.*, financial summary sheets listing all items of income and expense including the revenue source, "Interest, Treasury Funds." A comparison of the statements for the period ending June 30, 1964 and June 30, 1965 shows the crediting of interest to this Treasury account in the respective amounts of $901.65 and $8,087.71—a difference too dramatic not to have prompted inquiry given that the total interest-earning funds on hand in both periods were roughly the same—approximately $250,000 as opposed to $270,000.

Given the comprehensiveness and the regularity of the financial data provided to the Tribe, no other conclusion may be reached here save that the lack of inquiry demonstrates a lack of diligence. Hence, the claim alleging inadequate interest from January 1964 through October 18, 1965 is time-barred.

### *Interest Allowance on Advance Payments (Bad Settlement Claim)*

Under the long-term logging contracts as initially structured, the allottees were entitled to partial payments for their timber from the lumber companies prior to its being harvested. To fund these "advance payments," the lumber companies relied on borrowed capital. The companies were then permitted to claim the cost of obtaining this capital (*i.e.*, the interest expense involved) as an offset against the final stumpage prices paid to the allottees. In effect, the allottees financed their own advance payments. The practice was controversial and was finally discontinued in 1957.

In 1964, the Department of Justice sued the lumber companies for return of the interest cost allowances. In its complaint, the Department of Justice alleged damages of $101,999.60 against the Rayonier Corporation and $102,791.04 against the Aloha Lumber Company. However, in 1968, the

suit was settled for $73,000—an action which was opposed by the Quinault Allottees Committee. The decision to settle was apparently based on information gleaned from the deposition of a BIA official to the effect that the contractually-required periodic review and adjustment of stumpage values was more often than not accomplished by subjective reappraisal than by application of the log price criteria specified in the contract. Hence, the advance payments which the lumber companies had been obliged to make against these "intuitively-determined" stumpage values were subject to the certain criticism that they were procedurally irregular and more importantly, perhaps inaccurate. Thus there existed the distinct possibility that, in a Government suit for recovery of the associated interest expense, the lumber companies could prevail on the theory that they had been required to make larger advance payments than correctly-determined stumpage values would have required in the first instance.

The argument plaintiffs raise here is that the suit was wrongly settled. Say the plaintiffs: "[th]e General Accounting Office had calculated the amount of interest that had been allowed to the logger and a sum certain in damages could have been proved." Given this certainty, plaintiffs see the settlement as improvident. Alternatively, they argue that if the Government is not liable for making an improvident settlement, then it is liable because the case had to be settled for a fraction of its value because of the BIA's allegedly loose methods of calculating stumpage values. In either case, the essential claim is breach of trust.

■ Defendant characterizes the claim as one to recover cost allowances and argues that all events giving rise to the cause of action accrued before 1965, *i.e.* as a component of the stumpage claims. Hence, it asserts, the claim is time-barred. The court rejects this contention. Plaintiffs' claim is not to recover cost allow-

tion with additional information concerning tribal funds drawn from agency financial records. This information, filed on July 22, 1987 and September 17, 1987, was presented as

part of the affidavit of the Administrative Manager for the Western Washington Indian Agency, Bureau of Indian Affairs.

ances; it is, rather to recover what they see as a loss attributable to the Government's improvident settlement of a lawsuit. All events that gave rise to the claim obviously could not have occurred until the settlement occurred. Since the settlement took place within six years of the filing of this suit, the claim is not time-barred.

### Diversion of Interest Earned on Special Accounts Claim

As part of its administration of Indian affairs, the Government maintained various special deposit accounts in which money that was ultimately to go to an allottee was temporarily held before it was credited to the individual's account. For example, when an Indian sold land, the proceeds were placed in a special account and were not transferred into the individual Indian's account until title had cleared.

The most important of these special funds contained advance deposits paid by logging companies at the beginning of each month. These advance payments covered the estimated value of timber scheduled for imminent cutting or timber that had already been cut and was waiting to be scaled (measured). These receipts were placed in a special deposit account in the name of the lumber company. Payments to individual allottees were then made from the deposit account after the logs had been scaled and their ownership determined through receipt of the scale reports.

As money was paid out of the advance deposit fund, it was constantly replaced with new advance deposits. Thus, the fund contained a continuing "float." The float, in turn, earned interest. This interest was not credited to allottees' individual accounts, but was placed instead in an agency fund called—by the descriptively inaccurate title—the Indian Money, Proceeds of Labor ("IMPL") account. This account was used by the BIA as a kind of contingency fund with which to meet agency needs not provided for by appropriated funds.

The propriety of the Government's retaining the interest earned on special deposit accounts was among several issues concerning the BIA's management of funds belonging to Indian tribes that was challenged in *Cheyenne–Arapaho Tribes v. United States,* 206 Ct.Cl. 340, 512 F.2d 1390 (1975). Although the court in that case did not have occasion to address this issue directly (because it found the case as a whole not ripe for summary judgment), it did set forth certain guidelines for the trial court, including the following threshold observation: "It is clear from past opinions of this court and of the Supreme Court, and from the actions of both Congress and the Executive Branch, that funds appropriated to Indians to satisfy judgments of the Indian Claims Commission or of this court, as well as funds produced by tribal activities, are, when kept in the Treasury, held in trust for the Indians." 206 Ct.Cl. at 345, 512 F.2d at 1392. In 1980, the litigation was concluded by settlement.

Subsequently, Congress enacted legislation which prohibited the use of agency IMPL accounts after September 30, 1982 and provided for the distribution to tribes and individuals of all unobligated balances remaining on deposit in such accounts after that date. Pub.L. No. 97–100, 95 Stat. 1400 (1981), *as amended by* Pub.L. No. 97–257, 96 Stat. 839 (1982), *codified* at 25 U.S.C. § 155b (1982).

The allottees of the Quinault Reservation and the Quinault Tribe were beneficiaries of the aforementioned legislation and received refunds. However, the refunds covered only IMPL funds that were still in the hands of the BIA as of September 1982. For purposes of the distribution, it was assumed that the tribes and allottees with funds on deposit during the period from October 1, 1977 to September 30, 1981 were entitled to refunds of interest out of the IMPL fund. However, funds in special deposit accounts prior to October 1, 1977, were not given refunds, as it was presumed that any interest earned on them had been spent and was no longer on hand in the IMPL account as of September 30, 1982. The claim in this case is for the interest that accrued on special deposits prior to October 1, 1977. That interest, plaintiffs say, has never been accounted for. The claim, as best as plaintiffs can tell at this point, dates back to the early 1960's.

As to any interest that accrued before October 1965, plaintiffs contend that

they were excusably ignorant of the Government's practice of diverting interest on special deposit accounts to its own use because the Government never rendered an accounting of these funds. They point out also that the special deposit accounts were not discussed during the congressional hearings; indeed, the matter had never surfaced, even as rumor. Furthermore, plaintiffs contend that their potential claims would not have been discovered through a reasonable investigation of stumpage prices since that investigation focused on timber pricing and harvesting practices and not on the accounting procedures which traced the flow of funds from purchaser (the logger) to allottee. In fact, plaintiffs say they learned of the claim only through a "private tip" from a BIA employee.

Although the question is a close one, on balance the court cannot agree with the plaintiffs' position. A complete investigation into stumpage prices logically would have taken into consideration every step in the process by which allottees received a return on their timber—from the signing of the logging contracts to the deposit of money in the individual allottee's account. In this connection, we note that the General Timber Sale Regulations issued by the BIA, which were attached to and made a part of the Taholah and Crane Creek contracts, clearly identified that "cash deposits in advance of cutting will be required." Accordingly, plaintiffs' inquiry would have revealed the existence of the advance deposits and, in turn, the special deposit accounts, in which the advance deposits were retained until their ultimate disposition. From the delay in payment to the individual allottee which this bookkeeping procedure necessarily entailed, the question of interest earned in the interim would surely have become a point of inquiry. Based on this reasoning, the court must conclude that claims for interest money diverted to the IMPL account before October 1965 are time-barred.

### Fisheries

The Quinault Tribe has historically relied upon salmon fishing for subsistence and income. During the course of the timber contracts, loggers disrupted spawning grounds by removing gravel from streams on the Reservation and by clogging streams with debris. Plaintiffs contend that the Government's failure to prevent such practices, and to correct the damage caused by them, breached its fiduciary duty to the Tribe.

The practices about which plaintiffs complain were subjects of concern to the Quinault Tribe many years before the matter was brought into issue in this lawsuit. In 1953, for example, the Business Committee of the Quinault Tribal Council passed a resolution asking the BIA to take immediate action to prevent the Aloha Lumber Company from taking sand and gravel from the Quinault River. This logging practice, the resolution said, "has and does incalculable harm and damage to the runs of fish in said river." The record is replete with similar expressions of concern on the part of the Quinault Tribe.

No less troubling to the Indians was the accumulation of debris in the fishing streams—not only from natural forces but also from the years of logging operations on the Reservation. Recognition of the harm to fish migration caused by this congestion of the waterways and an awareness, in general, of the need to improve the quality of the fishing waters on the Quinault Reservation led eventually (in the early 1960's) to the establishment of a Western Washington Indian Fisheries and Game Commission and to the implementation of publicly-funded stream rehabilitation programs. The Quinault Tribe was actively involved in these undertakings.

Given these circumstances, there is no case here for saying that plaintiffs were excusably ignorant of the harm to the Reservation's fishing waters from adverse logging practices—the removal of gravel from the stream beds and the failure to retrieve downed timber—that occurred more than six years prior to the commencement of this lawsuit. Beyond any doubt, plaintiffs knew of and understood the detrimental significance of these practices years before the present claim was filed.

Plaintiffs say, however, that the acts they complain of did not happen just once.

Rather, they maintain that these environmentally injurious logging practices, though somewhat curtailed as a result of enforcement procedures begun by the BIA in the late 1960's, nevertheless continued well into the 1970's. Plaintiffs point out too that the harm from these practices is on-going in the sense that, so long as the harm-creating conditions remain uncorrected—the gravel not restored, the congestion not cleared—the adverse effects upon fish migration and reproduction continue. In short, they say, that theirs is a continuing claim in the same sense as the regeneration claim, *i.e.*, a claim characterized by the BIA's failure to perform an ongoing duty prescribed by law. The essence of the regeneration claim was the Government's continuing failure to implement the statutory directive of sustained yield growth; here it is the Government's continuing failure to insist upon compliance with timber sale regulations incorporated into the logging contracts which prohibited the obstruction of streams by felled trees and other logging practices harmful to the Indians' property.

Assuming the facts are as plaintiffs claim them to be—that the described logging-related practices are a source of continuing injury contributing to the long-term decline of the Reservation's fishing waters—then plaintiffs do, indeed, have a continuing claim, *i.e.*, the right to seek redress for the BIA's continued tolerance, after October 18, 1965, of logging practices and stream conditions detrimental to the Reservation's fishing waters.[6]

### III.

### CONCLUSION

Consistent with the foregoing, defendant's motion for summary judgment is granted in part and denied in part.

---

**6.** This holding intimates no position on the court's part as to whether the claim is redressable in monetary terms. That issue has not been raised. The court's only concern at this juncture has been on the issue of limitations.